EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* SALVADOR VILLANUEVA acusado y apelante.

No. 5569.—*Sometido:* Marzo 5, 1935.—*Resuelto:* Noviembre 15, 1935.

*R. Martínez Nadal* y *A. Reyes Delgado,* abogados del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

El Juez Asociado Señor Hutchison, emitió la opinión del tribunal.

Villanueva fué convicto del delito de asesinato en segundo grado. Los señalamientos primero y segundo figuran en el alegato en la siguiente forma:

"1.—La Hon. Corte de Distrito de Arecibo cometió grave error al instruir al jurado en los siguientes términos:

" ' (a) De la evidencia aportada por ambas partes, señores del jurado, ha quedado establecida por parte del fiscal la siguiente teoría: que el día 23 de septiembre del año pasado, el acusado llevaba relaciones con una joven llamada Lydia Rosa Hernández que era hija de Julio Hernández y de Teresa Martínez; que ese día el acusado se personó en la casa de Lydia Rosa Hernández como a las dos de la tarde y tuvo una conversación con Lydia Rosa Hernández en la sala; que más tarde, se encontraba el acusado en el balcón con Lydia y el acusado le manifestó a ésta 'vamos a un paseo' y ella dijo 'que no' y entonces el acusado le dijo a Lydia 'sabes, si no nos casamos de aquí a veinte días, te voy a matar'; que esa misma tarde, y como a las seis de la tarde, Lydia Rosa le devolvió las cartas al acusado Salvador Villanueva; que esa misma tarde y alrededor de las siete de la noche, volvió el acusado a la casa de Lydia Rosa Hernández, procuró por Lydia y le preguntó a Angelita, la hermana y ésta le contestó que estaba en el baño y el acusado preguntó a Lydia cuando ella salió 'si era verdad eso', porque ella le había devuelto las cartas, y ella le dijo: 'está todo terminado'; que ahí le disparó el primer

tiro, salió la madre y delante de ésta le disparó el segundo tiro; que la madre la encontró acurrucada al lado del sofá y al acusado parado y ahí la madre lo empujó hasta la escalera; que el segundo disparo, se lo hizo por la espalda; que el acusado manifestó delante de ciertos policías lo siguiente: 'qué más investigaciones ni más investigaciones. Yo fuí quien lo hice y voy contento a la cárcel.'

" '(b) Respecto de la prueba de la defensa uno de los testigos de ella declara que iba en dirección a un barrio que le dicen Los Cocos a una cita que tenía; que iba a pie; que conoce el sitio donde vive Julio Hernández; que vió esa noche a Salvador Villanueva con ocasión de que pasaba casualmente y oyó ciertos insultos de: 'borrachón, canalla, tú no te vas a casar con mi hija, lárguese de aquí;' que se detuvo a oír eso; que oía eso en casa de Julio Hernández; que las palabras fueron 'borrachón, canalla, usted no es un hombre para casarse con mi hija'; que se puso a observar allí y a los dos minutos sintió dos disparos; que no vió quién hizo los disparos; que se fijó que lo empujaban, al acusado, insultándolo, con esas palabras que ha dicho y otras que no se atreve decir; que se acercó al acusado cuando lo empujaban así y ya había salido de la verja y le dijo: '¿qué te pasa?' y salió en compañía de él hasta la Bala de Bronce y se puso a conversar con él hasta que llegó Charriz; que no le vió nada en la mano cuando salía de la casa; que quien lo echaba de la casa era una señora y que las frases fueron primero de las detonaciones. Otros testigos declaran que por una o dos veces mandó a buscar con un nene, hermanito de la interfecta, al acusado al garage del acusado, diciéndole que mandaba a decir ella que fuera allá.'

"2.—La Hon. Corte de Distrito de Arecibo cometió grave error al pronunciar ante el jurado, después de haber instruído sobre la ley y los hechos y haber catalogado los veredictos, cualquiera de los cuales podía traer el jurado, el discurso que a continuación copiamos:

" 'Señores del Jurado: Por ministerio de la Ley se os tomó a vosotros dos clases de juramentos: uno preparatorio y otro definitivo, para entrar en el ejercicio de vuestras delicadas y altísimas obligaciones sociales y judiciales. El primero exige que respondáis con veracidad a las preguntas que se os hagan con respecto a vuestras condiciones para servir como jurados. El segundo requiere, apelando para ello a vuestras conciencias de hombres honrados, que juzguéis la causa que pende ante vosotros ateniéndoos al resultado de la prueba y a los dictados de vuestras conciencias. Quiérese decir, que por el primer juramento empeñáis vuestra palabra de honor con el fin de

poneros en condiciones de poder cumplir lo que en el segundo de vosotros se requiere.

" 'Por eso aunque es innecesario que lo diga yo desde este curul judicial debéis entender que estos dos juramentos tienen una coexistencia y relación moral íntima e inseparable, estando, por tanto, ante la sociedad y vuestras conciencias obligados a cumplir con vuestro deber, no importando temores ni prejuicios ante la imperativa necesidad de hacer que se cumpla la justicia. Por algo existe (sic) la ley que el panel sea formado por doce miembros. Eso es un símbolo; constituís el apostolado más noble de los pueblos civilizados. Sois el apostolado de la justicia popular y en él no pueden caber ni los Pedros que niegan, ni los Judas que traicionan.

" 'Podrán levantarse oleadas de pasiones, podrán flamear llamas de odios alrededor de los casos que se traen a nuestros tribunales, pero nada de eso puede ni debe llegar hasta vosotros. El Jurado, como las aves de potentes remos, debe sostenerse en zonas tan altas y tan puras que hagan imposible que lleguen hasta él esas ruines y execrandas pasiones que han de pasar por debajo de vosotros como las tormentas y las nubes cargadas de fuego bajo las alas poderosas del águila y del cóndor.

" 'Y yo os concito, apelando a vuestras conciencias, a que resolváis este caso ateniéndoos exclusivamente a la solemnidad del juramento prestado, atemperándoos exclusivamente al resultado de la prueba practicada. Yo os pido que en cumplimiento de la palabra empeñada vayáis a la Cámara de deliberaciones libres de prejuicios como el islamita que deja a la puerta del templo sus sandalias para no manchar el sagrado recinto con el polvo del camino.

" 'La Corte confía en vosotros como hombres justos y como puertorriqueños que tenéis un claro y alto concepto del deber, y la justicia pública y vuestro pueblo espera de vosotros que cumpláis con ese deber.' "

La excepción a la primera instrucción se basó en la contención de que el juez al manifestar "a virtud de la prueba presentada ha quedado establecido por parte del fiscal", dijo al jurado que el fiscal había probado su caso. La defensa reforzó esta objeción indicando que al hacer un resumen de la prueba de descargo no se habían usado palabras similares.

El fiscal de esta Corte se funda en definiciones léxicográficas de las palabras "establecer" y "teoría". No discute la cuestión de hasta qué punto puede haberse dado una

interpretación algo distinta a la manifestación "ha quedado establecido por parte del fiscal la siguiente teoría", por el hecho de que la misma estaba precedida de la frase "de la evidencia aportada por ambas partes" y seguida por un extracto de la prueba aducida por El Pueblo. Sin penetrar en este aspecto de la cuestión, podría admitirse, sin resolverlo, que el lenguaje usado por el juez de distrito está sujeto a la interpretación dádale por el apelante.

Interpretadas en esa forma muy bien podría argumentarse que la exhortación impugnada en el segundo señalamiento equivalía a una instrucción para que se trajera un veredicto condenatorio. Sin embargo, la cuestión no es tanto si la corte de distrito cometió o no error como si el error, de haberlo, es uno que da lugar a la revocación. Si la corte hubiese cometido cualquier otro error claramente perjudicial al acusado, si la prueba en su totalidad hubiese dejado cualquier laguna por la cual éste hubiera podido escapar, si hubiera habido alguna base tangible para la teoría de homicidio, o si hubiera habido motivo para tener duda razonable, sería difícil evitar la revocación.

Empero, los dos extractos que se hacen de las instrucciones dadas por el juez al jurado, no fueron trasmitidos uno inmediatamente después del otro, conforme aparece en el señalamiento de error. Fueron el exordio y la peroración respectivamente de una instrucción que comprende trece páginas de la transcripción taquigráfica. El resumen de la prueba de la defensa no se hizo inmediatamente después de referirse a la teoría del fiscal, según figura en el señalamiento. El resumen de la prueba de la defensa que se hace en el señalamiento está incompleto. Además está seguido de un resumen adicional de otra prueba de cargo que comienza con la frase "Respecto de la prueba de cargo, o sea del fiscal. . ." A la referencia hecha a la teoría del fiscal le precedió un informe del delito imputado en la acusación, y le siguió la enumeración de los testigos que habían declarado en favor de El Pueblo. Después de esto, hay otro párrafo relativo al

certificado de defunción, a una gorra dejada por el acusado en la escena del suceso y al vestido usado por Lydia Rosa. El contraste existente entre la referencia hecha a la teoría del fiscal y el resumen de la prueba de descargo, separadas como están en las instrucciones dadas al jurado, no es tan llamativo como cuando en el señalamiento se coloca una inmediatamente después de la otra. A continuación del resumen de la prueba y antes de la exhortación final hay muchas páginas escritas a máquina conteniendo instrucciones sobre asesinato en primero y segundo grado, deliberación y malicia, expresa e implícita, la presunción de inocencia, el derecho del acusado a no declarar, el peso de la prueba, la definición y doctrina de duda razonable, y la facultad y deber exclusivos del jurado de apreciar la prueba. Este punto se hizo enteramente claro, y no es probable que se hubiese obtenido otro resultado valiéndose de palabras más apropiadas al referirse a la teoría del fiscal. No podemos asumir que el jurado pasó por alto todas las instrucciones intermedias y que interpretó la exhortación final en relación con la teoría del Fiscal como una instrucción terminante en pro de la causa de El Pueblo, o como una orden de que se rindiera un veredicto condenatorio.

A veces durante el juicio existe cierta atmósfera alrededor del caso, que se esfuma por completo en apelación. El juez, que vive en la comunidad, que ha presidido la corte durante el juicio y ha oído los argumentos de los letrados, está en mejor posición que este tribunal para determinar la necesidad de equilibrar las influencias extrañas llevando al ánimo del jurado la responsabilidad contraída con su juramento como jurados. Si bien, por regla general, los arranques de oratoria deben dejarse a los letrados de la defensa y de El Pueblo, la mera exhortación respecto al cumplimiento de un deber contraído por el juramento prestado no es suficiente motivo para que se revoque la sentencia.

El tercer señalamiento se dirige a la negativa del juez de distrito a trasmitir ciertas instrucciones sobre homi-

cidio voluntario. Si hubiera habido alguna prueba en qué basar un veredicto de homicidio, esta negativa hubiera sido un error que daría lugar a la revocación. En ausencia de tal prueba, la cuestión de homicidio no estaba envuelta y la corte no cometió error al negarse a dar la instrucción solicitada. Nada de lo que la madre de Lydia Rosa dijera a Villanueva antes o después de los disparos, fué suficiente provocación. Fuera de esto, nada hay en la prueba que sostenga la teoría de que Villanueva actuó ''en un arrebato de cólera, motivada por súbita y suficiente provocación'' (artículo 207, inciso 2 del Código Penal). Por consiguiente, la corte no cometió error al negarse a dar al jurado instrucciones sobre homicidio voluntario.

El alegato del apelante deja de convencernos de que el juez de distrito demostrara pasión, prejuicio o parcialidad durante el curso del juicio en forma tal que exija la revocación de la sentencia. Esto resuelve el cuarto señalamiento.

*La sentencia apelada debe ser confirmada.*