El Pueblo de Puerto Rico, demandante y apelado, *v.* Miguel Montañez, acusado y apelante.

Núm. 7345—*Sometido:* Marzo 10, 1939. *Resuelto:* Mayo 22, 1939.

854

*Joaquín Velilla,* abogado del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Miguel Montañez fué acusado por el Fiscal del Distrito de Humacao de un delito de asesinato cometido en la noche del 28 de diciembre de 1935, en Yabucoa, al dar muerte ilegal, con malicia premeditada y deliberación, al ser humano José B. Berríos, acometiéndolo con un revólver, produciéndole con sus disparos heridas que le causaron la muerte la misma noche.

Tuvo lugar el juicio finalmente ante un Jurado que declaró al acusado culpable de homicidio voluntario, imponiéndole la Corte por su sentencia, dictada en octubre 1, 1937, cuatro años de presidio con **trabajos forzados.**

Apeló Montañez, celebrándose **la vista del recurso en** marzo diez último con asistencia e **informe de los abogados** de ambas partes.

Doce errores señala el apelante. **Los cinco primeros se** refieren a la constitución del jurado, el sexto se dice cometido al no suspenderse el juicio, el séptimo al permitirse la declaración de cierto testigo, el octavo al intervenir el juez en el examen de los testigos, el noveno al no citarse a las partes al considerar una solicitud de inspección ocular y el undécimo al no transmitirse al jurado instrucciones que solicitara la Defensa. Por el décimo y el duodécimo se sostiene que el

veredicto no se ajusta a la prueba y que de ser culpable el acusado la pena que se le impuso es excesiva.

■■ Los dos primeros señalamientos se discuten por el apelante conjuntamente. Se imputa por ellos error a la corte "al no ordenar al márshal que presentara el *return,* en relación con la citación de los jurados que componían los distintos *panels*" y "al denegar la recusación de todo el *panel* formulada por el acusado."

La argumentación que contiene el alegato del apelante es muy extensa y elaborada. Para simplificarla parece lo mejor dejar que el récord hable por sí mismo contándonos lo ocurrido. Fué así:

"Defensor. El acusado está representado por el señor Pereyó y yo, y llamado el caso, Sr. Juez, nosotros estamos bajo la impresión de que en el *panel* ordinario figuran los Sres. Francisco Mújica (y) Dueño, de Juncos.

"Juez. Fueron excusados estos señores.

"Defensor. El señor Vicente Nieves, de Las Piedras.

"Juez. Fueron excusados los que faltan.

"Defensor. Entonces en el primer *panel* especial el señor Secretario debe llamar al señor Frank Matta.

"Juez. También fué excusado.

"Defensor. Y en el segundo *panel* especial no se llamó al señor Inocencio Vázquez.

"Juez. También fué excusado.

"Defensor. Ni al señor Miguel Nieves.

"Juez. Está excusado.

"Defensor. Entonces nosotros, Sr. Juez, en vista de que el jurado Manuel Portela Cabezudo ha sido informado ausente por el secretario, quisiéramos que se nos diera el *return* del márshal al efecto de determinar la forma en que han sido citados todos los Sres. jurados.

"Juez. Tenga la bondad de decirlo el Márshal limitándose al jurado Manuel Portela Cabezudo.

"Defensor. Nosotros queremos hacer la moción en el sentido que se nos traiga el *return* en cuanto al *panel* regular, mejor dicho en cuanto al *panel* especial segundo, ya que están presentes los del primer *panel* especial y los del ordinario.

"Juez. La Corte resuelve que sólo se traiga en cuanto al señor Portela que es el único que está ausente.

"Defensor. Entonces nosotros anotamos excepción porque se nos limita el derecho a plantear cualquier cuestión a base del *return*.

"Márshal. Fuí informado por el Jefe de la Policía Insular de Gurabo que el señor Portela Cabezudo se trasladó a otro pueblo y no conoce dónde vive.

"P. ¿No ha sido citado?

"R. No ha sido citado.

"Defensor. Entonces, nosotros, Sr. Juez, en vista de la información que suministra el Márshal, solicitamos que se recuse a todo el *panel* por razón de no haber sido citado uno de los jurados, tal y como dispone la ley.

"Juez. Sin lugar.

"Defensor. Nosotros anotamos una excepción."

En primer lugar el señalamiento va más lejos de la realidad. Abarca los distintos *panels,* cuando sólo se trató de uno. Y en segundo lugar no consta que el juez se negara en absoluto a ordenar al márshal que presentara el *return.* Después de haber informado el propio juez al abogado del acusado sobre los jurados que habían sido excusados, al pedirse por dicho abogado el *return* en cuanto al *panel* que comprendía al jurado Manuel Portela Cabezudo, dijo el juez, "La corte resuelve que sólo se traiga en cuanto al Sr. Portela que es el único que está ausente", y luego vino la declaración del márshal con respecto al motivo de la no citación.

Todo el argumento del apelante gira alrededor de no haberse cumplido fielmente con la ley y la jurisprudencia en cuanto a la citación de los jurados y a haberse el márshal servido de la policía sin estar autorizado para ello.

La ley aplicable está contenida en los artículos 211 y 212 del Código de Enjuiciamiento Criminal que prescriben:

"Artículo 211.—Recusar el 'panel' es la objeción puesta a todos los jurados que figuran en la lista presentada, y cualquiera de las dos partes puede ejercitar este derecho.

"Artículo 212.—Sólo puede fundarse la recusación de todo el jurado en que los procedimientos se hayan desviado considerablemente de las prácticas prescritas para el sorteo y formación de la lista de jurados, o en que se haya omitido citar intencionalmente a uno o más de los jurados sorteados."

Estamos conformes con el apelante en que las palabras "y formación de la lista de jurados" del texto español del artículo 212 no corresponden a la palabra "return" del texto inglés, que es la correcta.

La palabra "return" significa el informe formal acerca de un deber cumplido. (54 C. J. 740.) Así con respecto a la citación de jurados "habiendo ejecutado el mandamiento a él dirigido, es el deber del funcionario correspondiente hacer su diligenciamiento demostrativo de la forma en que ha procedido bajo el mismo, diligenciamiento que constituye prueba auténtica de las personas que han sido citadas para que comparezcan, y, en ausencia de cualquier indicación en contrario, será aceptado prima facie como cierto." 35 C. J. 278.

No se hace impugnación alguna en cuanto al sorteo. El énfasis se pone en la citación, involucrándose la llamada negativa de la corte a que el márshal presentara el *return* o sea el diligenciado de la orden de citación que recibiera, y en que no se pudo recurrir a la policía para cumplimentar dicha orden.

Ya hemos visto lo que consta de los autos sobre la negativa de la corte. Accedió ésta en cuanto al jurado dejado de citar, que era lo único que por entonces estaba en discusión, y el acusado no insistió, ni demostró entonces ni demuestra ahora que existieran motivos fundados para creer que la citación no se había hecho en forma en cuanto a los demás jurados, de suerte que después de tanta discusión el único hecho comprobado es el de haberse dejado de citar el jurado Portela porque el Jefe de la Policía de Gurabo informó al márshal que se había trasladado a otro pueblo, sin que el márshal conociera cuál era.

¿Constituye eso la desviación que tuvo en mente el legislador cuando ni siquiera se alegó, ni menos se demostró que la citación se dejara de hacer intencionalmente? A nuestro juicio se impone una respuesta negativa que queda robuste-

cida al aplicar a este caso el razonamiento y las conclusiones a que esta propia corte llegara en el del *Pueblo* v. *López,* 49 D.P.R. 329. En él la corte, por medio de su Juez Asociado Sr. Wolf, a las páginas 331 y 332, se expresó así:

"Más tarde el acusado atacó el *panel* tal y como quedó constituído. Esencialmente el ataque, según lo entendemos, se basó en el fundamento de que cierta persona, que iba a ser citada como jurado, no fué realmente citada.

"El apelante se quejó en verdad de que el márshal no había hecho diligenciamiento respecto a los jurados efectivamente citados. Los autos que tenemos ante nos demuestran realmente que las personas que constituyeron el *panel* del que se insaculó el jurado en este caso, fueron todas debidamente citadas, con la sola excepción mencionada, y el dejarse de hacer el diligenciamiento, de ser un error, no fué perjudicial.

"Yendo ahora a la omisión de citarse a determinada persona, la jurisprudencia es suficientemente clara de que a menos que tal omisión sea intencional, no debe prevalecer una recusación al *panel.* Esto es enteramente consistente con nuestro estatuto, que lee así: (Art. 212 del Código de Enjuiciamiento Criminal ya transcrito.)

"Igualmente, según hemos resuelto, y otros tribunales también lo han hecho, la constitución de un *panel* descansa en gran parte en la discreción de la corte sentenciadora. *El Pueblo* v. *Lanausse,* 30 D. P.R. 732; *El Pueblo* v. *Vázquez,* 20 D.P.R. 361; *El Pueblo* v. *Pillot,* 20 D.P.R. 376; *El Pueblo* v. *Juliá,* 25 D.P.R. 258.

. . . . . . . . . .

"Como sucede corrientemente, al ser llamada la causa para juicio había jurados listos para intervenir en el juicio. Sin embargo, en casos de asesinato, la corte sabe que los jurados puede que no sean suficientes y de ordinario da los pasos necesarios para citar otros adicionales. Nuestro estatuto provee que la citación será hecha por un funcionario de la corte, pero el márshal que de ordinario actúa está autorizado para utilizar a agentes con tal fin y aun a valerse de telegramas, conforme se hizo en el caso que tenemos ante nos. *El Pueblo* v. *Lanausse,* supra. . . . ."

 Los errores tercero y cuarto se discuten también conjuntamente. Se refieren ambos al jurado Ramón Rivera Alverio.

Rivera fué llamado para actuar como jurado en un juicio anterior de la propia causa y fué recusado. El abogado del acusado le pidió que expresara el motivo de la recusación. El fiscal se opuso. Y la corte resolvió la cuestión suscitada como sigue:

"Lo que la Corte cree es que no es necesario; que nada de lo que ocurrió en el otro procedimiento en cuanto a la selección del jurado tiene valor ahora, sino que ahora se debe hacer la pregunta con relación a la situación actual para recusar o no, según convenga a las partes."

Continuó el examen haciéndosele al jurado por la defensa varias preguntas sobre su estado de ánimo para rendir veredicto. De ellas transcribimos:

"P. Entonces, Sr. Rivera ¿usted está en condiciones de ánimo de poder llegar a un veredicto imparcial y justo, estrictamente ceñido a la prueba que se practique y desfile aquí en este caso?

"R. Sí, señor.

"P. ¿De modo Sr. Rivera que de acuerdo con su estado de ánimo, si este acusado probara que es inocente, Ud. sin vacilación ninguna emitiría un veredicto de no culpable?

"R. Si la prueba lo justifica emitiría un veredicto de no culpable.

"P. De modo Sr. Rivera que si este acusado no probara que es inocente, ¿cuál sería su veredicto?

"R. Lo declararía culpable."

De la última contestación deduce el apelante que el jurado no estaba en condiciones de rendir un veredicto imparcial. No lo creyó así la corte por estimar que se trataba de una cuestión de derecho que no pudo ser bien entendida por el jurado.

Nos inclinamos a creer que la corte en ambas ocasiones actuó correctamente. No era necesario investigar el motivo de la recusación en el juicio anterior teniendo como tuvo el acusado la mayor amplitud en el examen de las condiciones en que se encontraba el jurado en el momento en que se le llamó de nuevo para actuar como tal. Y en cuanto a la contestación de que se trata dada como lo fué en el curso de una

serie de preguntas y contestaciones demostrativas todas las contestaciones de la imparcialidad del jurado, no puede considerarse que tenga el alcance que le dió y le da la Defensa.

Además, aunque la corte hubiera actuado erróneamente, como el acusado no recusó luego al jurado perentoriamente sin que llegara a agotar el número de recusaciones perentorias que le concedía la ley, el error no podría servir de base para una revocación. *Pueblo* v. *Morales,* 45 D.P.R. 191, *Pueblo* v. *Vázquez,* 20 D.P.R. 361.

El quinto señalamiento se formula como sigue: "El Tribunal inferior incurrió en error al limitar, indebidamente, el examen *voir dire* en relación con el jurado Facundo Colón."

Según los autos ocurrió lo que sigue:

"Defensor. P. Con la venia de la Corte, Colón, ¿usted conoce al acusado?

"R. Sí, señor, lo conozco.

"P. ¿Y conoció a don José Berríos?

"R. No, señor.

"P. ¿Y los hechos de este caso le son conocidos?

"R. Por información de la prensa.

"P. ¿Esa información recibida por Ud. le ha llevado a formar juicio sobre esta causa?

"R. No, señor.

"P. ¿Entonces está usted en condiciones de ánimo de resolver este asunto a través de la prueba que desfile aquí exclusivamente?

"R. Sí, señor.

"P. En esas condiciones si este acusado le demostrara a usted que es inocente, ¿cuál sería su veredicto?

"R. No culpable.

"P. Y si no le demostrara a usted que no es inocente, ¿cuál sería su veredicto?

"Fiscal. No conteste, nos oponemos a la pregunta en la forma que se ha hecho.

"Juez. Se permite la pregunta, conteste.

"Defensor. P. Dijo usted que si él le probase ser inocente que su veredicto sería no culpable, ahora la pregunta específica, y si él no le prueba ser inocente, ¿cuál sería su veredicto?

"R. Sería de acuerdo con la prueba.

"P. Y si de acuerdo con la prueba que el acusado practique no. le demuestra a usted ser inocente, ¿cuál sería su veredicto?

"Fiscal. No se ha dicho cuál es la prueba.

"Juez. La Corte sostiene al Fiscal y declara con lugar la objeción; en realidad la pregunta, tal como está hecha, no debe formularse al jurado pues envuelve un elemento técnico, de necesaria ilustración previa antes de que el jurado pueda contestar.

"Defensor. ¿Entonces yo no puedo seguir el interrogatorio en esa forma?

"Juez. No, esa pregunta."

Continúa el incidente en el mismo sentido ocupando varias páginas más del récord. Se observa que el defensor siguió aquí la misma táctica que en el caso del jurado Portela. Aparentemente se trató de envolver al jurado involucrando en las preguntas una cuestión de derecho. Como en el caso anterior, nos parece que si la corte hubiera permitido al jurado que contestara, una vez que se le hubiera explicado claramente la situación, no hay duda de que su respuesta hubiera estado a tono con las demás que diera demostrativas todas de que se econtraba en perfectas condiciones de actuar y se hubieran eliminado los incidentes.

La corte, sin embargo, optó por intervenir en la forma que conocemos y nos inclinamos a creer que usó correctamente de su discreción o que por lo menos no abusó de ella. Su actitud no constituyó una limitación del derecho del acusado al examen de los jurados. Hablando por sí mismos, dicen los autos que el acusado ejercitó ampliamente ese derecho.

■ El sexto señalamiento atribuye error a la corte sentenciadora al no decretar la suspensión del juicio por la falta de comparecencia de un testigo.

Hemos examinado los autos y no surge de ellos abuso de discreción por parte de la corte. La petición se hizo después de constituído el Jurado, y si el acusado no se enteró de la enfermedad de su propio testigo, lo fué porque no ejercitó la debida diligencia. Además no surge clara la materialidad de la declaración, ni tampoco que no estuviera al alcance del

acusado obtener otro testigo de igual clase demostrando más bien los autos que estaba al alcance del acusado obtener otro testigo, ya que lo que se trataba de probar por medio de la declaración del testigo que no pudo comparecer por razón de enfermedad y que era jefe de la policía insular en Yabucoa en la noche del crimen, era que "dicho jefe en compañía de otros oficiales de orden público oyó disparos" y con motivo de ellos "arrestó a otra persona que no fué el acusado por portar armas y hacer uso de un revólver en el sitio." Y si ello era así y se encontraban presentes los "otros" o algunos de los "otros oficiales" de orden público ¿por qué no tratar de acreditar con sus testimonios el indicado hecho?

█ No fué, pues, cometido el sexto error. Tampoco el séptimo que se formula como sigue: Erró el tribunal "al permitir que el testigo José María Ortiz declarara que el acusado estaba embriagado en los momentos de ocurrir el crimen."

José María Ortiz es un abogado que ejerce en Yabucoa. En la noche de autos se encontraba con unos amigos entre ellos el interfecto Berríos en la plaza del pueblo. Preguntado sobre lo ocurrido contestó:

"R. Al poco rato de nosotros estar allí en la plaza venía el acusado de abajo de la calle Cristóbal Colón hacia arriba y se sentó en un murito en una pequeña alcantarilla que da al frente de la plaza y empezó a insultar, a pronunciar palabras obscenas y entonces el Sr. Berríos le llamó la atención de que no debía producirse en esa forma porque nosotros no estábamos haciéndole nada a él, entonces él volvió otra vez con otras frases en la misma forma.

"R. El acusado se levantó y se fué un poco hacia la calle, la otra calle, o bien sea la calle Luis Muñoz Rivera, y entonces en ese sitio sacó el revólver y en el momento de sacar el revólver nosotros que estamos en la plaza sentados inmediatamente corrimos hacia ellos que estaban parados, . . .

"P. Continúe, ¿qué más hicieron?

"R. Entonces en ese momento, me parece que fué el Sr. Berríos, no recuerdo exactamente, se le dijo, usted lo que debe hacer es irse

a dormir. en realidad, porque el hombre estaba . . .

"Defensor. No lo diga.

"Fiscal. P. Diga cómo estaba, cómo no.

"R. En estado de embriaguez, ésa es la realidad.

"Defensor. Que se elimine la contestación.

"Juez. Sin lugar, como una apreciación del testigo.

. . . . . .

"Defensor. Él necesitaría, para hablar sobre el estado de una persona, que cualificarse como perito médico, o lo que se puede decir por un testigo cualquiera es hablar sobre manifestaciones exteriores de un estado determinado.

"Juez. La Corte sostiene que cualquier persona de normal capacidad está cualificada para declarar sobre el aspecto de cualquier persona que esté borracha.

"Defensor. Yo acepto que pueda declarar sobre el aspecto pero no puede declarar sobre el estado que son dos cosas distintas.

"Juez. Sobre el estado de borrachera de cualquier persona.

"Defensor. Nosotros anotamos una excepción.

"Juez. Ahora en la repregunta S. S. puede dilucidar detalles con relación a ese hecho para demostrar que la apreciación está mal formada. Puede continuar el Sr. Fiscal."

La actuación de la corte está sostenida por la jurisprudencia. En el caso del *Pueblo* v. *Gerardino,* 37 D.P.R. 185, 197, dijo esta corte, por medio de su Juez Asociado Sr. Franco Soto:

"Desde Hipócrates, ya la tuberculosis pulmonar se estudiaba y se describía en sus obras. Su generalización en la humanidad ha sido tal, por la falta de remedios específicos, que los signos físicos de la enfermedad son familiares a personas profanas. De esto no vamos a decir que los conocimientos basados en la experiencia sean un dictamen pericial para el juez sentenciador, pero son datos o circunstancias que eran para ser apreciados por la corte en relación con los demás elementos de prueba."

Y el tratadista Underhill en su obra sobre Evidencia en lo Criminal, sección 231, pág. 432, se expresa como sigue:

" . . . así también, una persona que no sea un perito puede declarar si un individuo estaba borracho o sobrio, o si estaba en su opinión bajo la influencia de bebidas embriagantes, o que tal indi-

viduo demostraba estar borracho o estar bebiendo, y el testigo por
lo general debe presentar los hechos sobre los cuales basa su opi-
nión, aunque esto no es siempre necesario.''

**■** Por el octavo señalamiento se imputa error a la corte
''al intervenir su juez en forma inconsulta en el examen de
los testigos.''

Tras un estudio de la transcripción de la evidencia, cree-
mos que es suficiente contestación al señalamiento lo que dice
el fiscal en su alegato, a saber:

''También es frívolo este supuesto error. En primer término, la
defensa en ningún momento llamó la atención de la corte ni objetó
su conducta sobre el particular; y en segundo término, porque la
conducta observada por el juez durante todo el juicio, y su interven-
ción limitada con el examen de los testigos, en ningún momento re-
veló al jurado que su mente estuviera inclinada a uno u otro bando.
*Pueblo v. Gutiérrez,* 44 D.P.R. 29; *Pueblo v. Villanueva,* 49 D.P.R.
63; *Pueblo v. Cruz,* 46 D.P.R. 538; *Pueblo v. Millán,* 46 D.P.R. 889;
*Pueblo v. Saltari,* 53 D.P.R. 893.''

**■** El noveno error no existe. Se sostiene por él que la
corte sentenciadora erró ''al no citar a las partes al consi-
derar una solicitud de inspección interesada por el jurado,
así como al denegar la misma.''

Según los autos, ocurrió lo que sigue:

''Presidente del Jurado. Hon. Juez, el jurado ha acordado soli-
citar de la Corte que nos permita trasladarnos a Yabucoa para pre-
senciar el sitio donde ocurrió el hecho.

''Juez. P. ¿El Sr. Presidente puede informar a la Corte si el
jurado ha cambiado impresiones entre sí sobre la absoluta necesidad
que existe de este paso?

''R. Bueno, el acuerdo fué por mayoría.

''P. ¿Por?

''R. Mayoría.

''Juez. La situación está en que pudiera ser que una considera-
ción de la medida determinaría el que no fuera absolutamente nece-
sario el traslado. Desde luego, si después de considerar la medida
nuevamente resulta necesario, imprescindible, el traslado, la Corte
accedería; desea concederle una nueva oportunidad porque de cual-

quier manera, aún cuando la Corte desea poner al jurado en condiciones de que rinda su cometido de la manera más eficaz y más consciente posible, si en cada caso tuviera que realizarse una inspección, por su costo y por el tiempo a invertirse en cada uno sería ello un impedimento en vez de un beneficio para la administración de la justicia. Sin embargo, el criterio de vosotros será el que ustedes crean, y si ustedes creen que es una cosa imprescindible, se lo informarán a la Corte y volverá a considerarse la solicitud.

"El jurado nuevamente se retiró a deliberar."

No consta de los autos que el abogado del acusado estuviera ausente ni que formulara excepción a la resolución de la corte. Ésta no se negó en absoluto a acceder. Dejó el asunto a la nueva consideración del jurado y éste no insistió. La Corte tuvo discreción para actuar en la forma en que lo hizo. No hubo error.

 El undécimo error tampoco fué cometido. El acusado por su abogado presentó a la corte unas largas y repetidas instrucciones—doce en número—sobre duda razonable y le pidió que las trasmitiera al jurado. La corte procedió entonces a dar por sí misma las suyas que cubren amplia y correctamente la materia. Al terminar dijo el defensor: "La defensa quisiera informarse de qué ha resuelto el tribunal en relación con unas instrucciones solicitadas", y contestó el juez: "Ya está cumplido el trámite que dice la ley, sustancialmente incluídas en las rendidas", anotando el defensor su excepción.

Habiendo quedado cubierto el campo debidamente como ya dijimos, esto es, habiendo el juez instruído por sí mismo correctamente sobre la duda razonable, no tenía la obligación de trasmitir al jurado las instrucciones preparadas por la defensa por correctas que ellas fueran, según se ha resuelto repetidas veces por este propio tribunal.

 Por el décimo error se sostiene que el veredicto no se ajusta a la prueba.

Conocemos ya la declaración del testigo presencial de cargo Ortiz. Otro de los testigos de cargo, Rogelio Rodríguez, dependiente de comercio, declaró:

"Terminado el baile salimos Berríos, Paco Díaz y yo por la calle Luis Muñoz Rivera hacia arriba, hacia la plaza . . . nos encontramos allí con algunos amigos que estaban sentados en un muro de la plaza que está en esa misma esquina, . . . empezamos a hablar del baile que se había terminado demasiado pronto . . . el Sr. Miguel Montañez . . . se sentó en una alcantarilla que queda frente al lado opuesto . . . ya habíamos cambiado el tema, y estábamos hablando del tema político, entonces el Sr. Montañez se levantó en actitud . . . colérica . . . y empezó a hablar palabras obscenas del partido Socialista y de la Coalición. . . . Cuando él se expresaba en esta forma el Sr. José Berríos le llamó la atención diciéndole que nosotros estábamos allí en camaradería y que estábamos discutiendo allí asuntos de nuestra incumbencia, que no nos interrumpiera, y que no nos habíamos dirigido a él, que él no tenía razones para ofenderse, pero a pesar de eso siguió manifestándose ofendido el Sr. Montañez y entonces el Sr. Berríos volvió a decirle que si él quería comprar algún compromiso entre él y algunos de los que estaban allí, inmediatamente el Sr. Montañez manifestó que él tenía su revólver y que él se disponía a cualquier cosa, entonces sacó inmediatamente su revólver, él hizo o invitó a Berríos para que le acompañara a pelear y entonces Berríos le decía que él no necesitaba revólver para él, que si necesitaba pelear que él con su brazo era suficiente, entonces los que estábamos en el grupo vimos la gravedad del asunto y quisimos intervenir y persuadir a Montañez de que iba a cometer un error pero él no quiso convencerse y continuó retando al Sr. Berríos, . . . y siguió hacia el frente con el revólver en manos y Berríos detrás, y en la acera de la derecha íbamos el Sr. Miguel con nosotros, un servidor y nosotros, atrás iban el grupo, y al llegar frente al teatro el Sr. Montañez le hizo el primer disparo a Berríos, yo le advertí entonces a Berríos que era el momento de defenderse, que se defendiera, que estaba corriendo peligro, a pesar de que el primer disparo de Montañez le había fallado pero parece que Berríos hizo caso omiso a la advertencia que yo le hice, entonces Montañez volvió a dispararle nuevamente y entonces la bala parece que hizo blanco, . . . en Berríos y se fué como para caer hacia el lado derecho y fué a caer en la misma boca calle a la parte detrás del poste que queda en la esquina, inmediatamente volvió Montañez y le hizo el segundo disparo, allí hizo forcejeo el Sr. Berríos para sacar el revólver y del suelo, se notó que hizo una fuerza sobrehumana para levantarse y disparó contra el Sr. Montañez que en esos momentos se escudaba del poste que quedaba entre él y Berríos entonces volvió Montañez y le disparaba y se escondía detrás del poste y Berríos volvía a hacerle disparos.''

Y el doctor Miguel Veve, médico-cirujano, manifestó:

"El 29 de diciembre de 1935 en Yabucoa cuando llegué yo a la sala de emergencia ya él (Berríos) estaba muerto. . . toqué el pulso porque me decían que estaba vivo, ya el corazón había dejado de latir, no había pulso ninguno, inmediatamente hice despojarlo de las ropas, encontré una herida con orificio de entrada y salida en el brazo izquierdo. . . Herida de bala, encontré una herida en el borde posterior de la axila, en la plegadura posterior de la axila. . . Esa no tenía salida. . . De bala, y además había una herida de bala con orificio de entrada, sin orificio de salida en la región lumbar izquierda . . . fué la causa de la muerte. . . La herida de bala con una hemorragia intensa, y desde luego una muerte casi instantánea, la perforación del corazón, la herida del riñón, una gran hemorragia, hubiese dado tiempo a hacer algo pero era mortal por necesidad también."

Preguntado sobre la condición del acusado, contestó:

"Estuve en el cuartel a requerimiento del Fiscal, de S. S. para que examinara a Montañez el acusado que tenía una herida contusa en el lado superior o inferior . . . él objetó mi asistencia y prefirió al Dr. Cintrón a quien se mandó a buscar a su casa, . . ."

Lo transcrito es suficiente para formar una idea de la prueba de cargo. Para formarla también de la prueba de descargo, bastará transcribir lo pertinente de las declaraciones de Virgilio Medina, del Doctor Julio Cintrón y del propio acusado.

Medina declaró:

"Los primeros disparos salieron del grupo donde estaba Berríos y donde se encontraba Montañez a la vez, de allí fué que salió Miguel Montañez corriendo . . . tan pronto Montañez se parapetó detrás del poste entonces fué que nosotros notamos la detonación y la candela que salía de los disparos que se hacían detrás del poste, y después sentimos otros disparos más pero que no puedo decir de a donde se hicieron porque en realidad no vi salir más nada."

El Doctor Cintrón depuso:

"A instancias del Sr. Fiscal curé al Sr. Montañez. Yo llegué al cuartel de la policía pero le manifesté al Sr. Fiscal que allí yo no podía curarlo que tenía que ser trasladado al hospital. . . . Una vez

en el hospital entonces procedí a buscar el sitio de la herida cosa que me fué excesivamente difícil porque resulta que cualquier movimiento que hacía el Sr. Montañez me obscurecía, . . con mucho trabajo y al cabo de bastante tiempo pude localizar por fin una herida de bala en el labio superior. Sostengo que es herida de bala por la circunstancia siguiente, de que si no fuese herida de bala, es decir que hubiese un agujero yo no hubiera podido introducir el estilete y ese estilete sostiene el hecho de que había un agujero que aguantaba el estilete, . . . "

Y el acusado se expresó como sigue:

" . . . esa noche sucedió que yo salí del baile liberal que se celebraba en la casa donde vivía últimamente el Dr. Roure Macías, Cirujano Dental, . . . y al pasar . . . frente a la plaza, un poco más antes de llegar allí oí a un ciudadano que estaba allí entre medio de ellos, estaba Román, estaba Pepe Berríos, estaba Luis Cordero, el Lcdo. Ortiz, Miguel Angel. . . . Estaba diciendo que los liberales eran nada más que unos canallas, palabras demasiado de malas, entonces yo en vez de pasar por el frente pasé por el ángulo que hace la plaza, atravesé la plaza a salir frente al cuartel de la policía y así en este lado encontré a Virgilio Medina sentado y al maestro Agustín, bajé hasta abajo a casa de Carmelo Martínez, compré un tabaco. . . . Para ir para casa a dormir, al llegar frente al grupo dijo uno mira allá viene ese canalla otra vez entonces salió del grupo Pepe Berríos, vino hacia mí y me dijo: 'por qué tú no te has largado ya a dormir', entonces me cogió por aquí por los dos brazos cuando yo hablaba con él y le decía que qué iban a hacer ellos conmigo, que yo era solo porque yo vi la actitud de él contra mí, entonces me dieron por detrás, al darme por detrás es muy justo que yo me cambiara para ver quién me daba y contestar la agresión con la agresión, darle un puño, allí me cayeron encima todos a pesar de eso yo al que le podía dar le daba e iba reculando para atrás, para atrás en forma tal que cuando estoy sacando el cuerpo arranco a correr pero cuando iba llegando a la esquina de la calle San Rafael oigo que detrás de mí los que vienen dicen: 'vamos a acabar, vamos a matar a ese perro, rómpanle una pata a ese perro', entonces cambié y al cambiar oigo dos detonaciones y sentí como que me llevaban un lado de la cara, ahí me eché mano y me metí detrás de un poste, al meterme detrás del poste yo portaba un revólver negro, calibre 38, y desde luego no tuve otro remedio que rasgarme la camisa e hice tres disparos al grupo, al hacerle tres disparos me dieron con

una cosa por detrás, me fuí hacia alante así, y perdí el equilibrio y se me fué el revólver de la mano, se me cayó ·y cuando me ví desarmado y sin nada no me quedó otro remedio y arranqué a correr, y otros detrás de mí todavía disparándome, yo sentí disparos por la espalda mía hasta que llegué a casa, allá me fué a coger el guardia Andrés, no me recuerdo el apellido. . . . De allí me condujeron al cuartel de la policía todo bañado en sangre, entonces el policía Estrada fué y buscó un poco de algodón y yo me ponía compresiones porque la sangre era demasiado y yo cogí un paquete grande de algodón y me lo ponía ahí bien apretado para que saliera menos sangre que allí como a las dos horas o tres después fué el Dr. Cintrón, me vió, yo de eso no puedo contar de ahí porque yo estaba ya se puede decir muerto porque yo no sentía nada de eso, yo no sentía allí ni cuando me curaron, yo vine a despertar después en la carretera, yo no sentí por más inyecciones según me dicen, que me pusieron inyecciones.''

Conocida esa evidencia no es posible dejar de concluir que el jurado tuvo ante sí prueba suficiente para, dirimiendo el conflicto existente entre la misma, rendir el veredicto de culpabilidad que rindiera. No hubo error.

El último señalamiento se formula así:

''Que de ser culpable el acusado del delito imputádole, la pena impuesta es exageradamente excesiva.''

Según los autos, el primero de octubre de 1937, día fijado para el pronunciamiento de la sentencia, compareció el convicto en persona y por su abogado. Al preguntar el Juez si había algún motivo por el cual no debiera dictarse la sentencia, contestó el abogado que sólo quería presentar cierta prueba. En efecto introdujo al testigo Ernesto Carrasquillo que declaró que era vecino de Yabucoa,· representante a la Cámara por el distrito Humacao–Yabucoa, que conocía al acusado desde hacía veinte años y a él refiriéndose dijo que era buena su reputación, que estaba casado y tenía tres hijos, que nunca había cumplido condena por delito grave y que era un ciudadano ejemplar.

Manifestó entonces el abogado que el acusado de declarar diría que era casado, con tres hijos, y pidió ''a la corte que

al dictar sentencia tenga en cuenta que el acusado tiene familia, que es una persona dedicada a sus labores, siempre lo ha sido y que ha demostrado siempre ser de una reputación buena en la comunidad, que por lo tanto sea lo más benigno posible en la imposición de la pena.''

Entonces el juez habló y actuó como sigue:

''Póngase de pie el acusado. Al dictar sentencia en este caso la Corte tiene muy en cuenta su impresión sobre los hechos ocurridos el día de autos. Esa impresión es que si bien es verdad que usted dió muerte a la persona que se alega fallecida por consecuencia de sus disparos, el día 28 de diciembre de 1935, usted fué llevado a la pelea en este caso que dió muerte a dicha persona. De manera que usted voluntariamente no fué la persona que inició el combate, sin que esto implique una crítica para el veredicto del jurado que la Corte entiende que se ajusta a derecho. Claro que hay circunstancias de fuerza para que la pena ya no sea la que impone habitualmente esta Corte en casos en que el homicida ha provocado la contienda, o ha tenido por lo menos tanta intervención culpable como la otra parte en la riña. Se le imponen cuatro años de presidio.''

Siendo ése el caso, no creemos que el acusado pueda quejarse. Pudo el juez imponerle diez años de presidio. Lo condenó a cuatro. No se advierte abuso alguno de discreción. No hubo error.

*En tal virtud, no habiéndose cometido ninguno de los errores señalados, debe declararse el recurso sin lugar y confirmarse la sentencia apelada.*