EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAFAEL RIVERA MÁRQUEZ, acusado y apelante.

*Número:* CR-67-258          *Resuelto:* 16 de diciembre de 1968

*E. Armstrong de Watlington, Enrique Miranda Merced* y *Julio García Antique,* abogados del apelante; *Rafael A. Rivera Cruz, Procurador General,* y *Lydia Nieves Franqui, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

En la noche del 27 de enero de 1966 murió una persona de un tiro en la cabeza en el negocio de Ismael Travieso, situado en el Bo. Canta Gallo de Juncos. Según testimonio de autopsia y por razón del tatuaje habido en el orificio de entrada de la bala, el disparo debió hacerse por lo menos a dos pies de distancia.

Por esta muerte se acusó al apelante Rafael Rivera Márquez de asesinato en primer grado; de infracción al Art. 8 de la Ley de Armas por portar y conducir un arma de fuego cargada y de infracción al Art. 6 de la misma por poseer un arma de fuego sin tener licencia para ello. Celebrado el juicio ante jurado, éste declaró al apelante convicto de asesinato en segundo grado y del Art. 8 de la Ley de Armas, portar y conducir un revólver cargado. La Sala sentenciadora como tribunal de derecho lo declaró convicto de infracción al Art. 6 de esa ley, posesión de un arma sin tener licencia para ello.

El convicto interpuso recursos de apelación en las tres convicciones. La Sala de Humacao del Tribunal Superior fijó fianza en todas ellas pendiente la apelación.

Por resolución que dictamos el 31 de enero de 1968 designamos a la Sociedad para Asistencia Legal para que asistiera al apelante. La Sociedad nos pide la revocación de las sentencias dictadas.

—I—

La prueba en el récord, bastante breve, se resume así:

El primer testigo del fiscal sobre los hechos fue Ismael Travieso, dueño del negocio. Entre ocho y ocho y media de la noche del 27 de enero estaba en su negocio el acusado acompañado de dos o tres personas más, entre ellas la víctima. Estaban sentados en una mesa tomando. Hablaban y charlaban y no se suscitó allí discusión o pelea alguna. La víctima pidió una cerveza y se la tomó. Otro que estaba con el apelante pidió tres cervezas para ellos. De momento

uno se levantó a echarle un vellón a la vellonera. La víctima y el apelante quedaron en la mesa. Cuando el testigo estaba doblado sacando una cerveza de la barra, de momento ahí salió el apelante, tenía un revólver en la mano y ahí mismo le disparó. Vio cuando el apelante disparó y cuando tenía el revólver ahí, hacia la cabeza del occiso. Al disparo la víctima cayó de frente y "el acusado salió brincando, contestó, 'que yo he hecho' ". Identificó un revólver como el que le vio al apelante en las manos. Dijo que la víctima no tenía arma alguna al recibir el disparo.

Contrainterrogado, y con miras a la declaración jurada que prestara ante el fiscal declaró que una tercera persona de nombre Carlos Enrique y otro de nombre Pacheco estaban allí como desde las siete de la noche. Reafirmó que al sonar el disparo el apelante decía: "Dios mío, que yo he hecho!" En momento alguno éste amenazó a la víctima, pero dijo el testigo que antes había dicho "esta noche yo tengo que hacer una de las mías." Antes de llegar el testigo al negocio, como a las siete y media, lo estaba atendiendo su esposa. Ella le había dicho que el revólver lo llevó allí Carlos Enrique Santiago para venderlo. Que salió a venderlo.

El segundo testigo del fiscal fue Mario Pacheco Olmeda. La víctima era su amigo de la infancia. Al ocurrir los hechos se encontraban en el negocio de Travieso. Quedaban el acusado y la víctima. No hubo allí peleas, discusiones, insultos ni nada, nada excepto el tiro que le pegaron, hecho por el apelante. No vio el momento del disparo porque había salido afuera a la calle y al salir oyó la explosión. Volvió hacia atrás y vio al occiso tambaleándose con las manos en la cara, y caer al piso. En ese momento el apelante había salido corriendo. La víctima no tenía armas y vio el revólver en el suelo dejado por el acusado.

Contrainterrogado por la defensa dijo que había llegado al negocio en los momentos del disparo; que no lo presenció. Conocía de vista a Carlos Enrique Santiago y andaba con

él. Vio el arma por primera vez en el suelo, no la vio en manos del apelante. El acusado iba corriendo, "que dijo, 'Dios mío, que yo he hecho!'"

Preguntado nuevamente por el ministerio público declaró que el apelante había comentado "esta noche voy a hacer una de las mías." Volvió a decir que conocía a Carlos Enrique Santiago y que en ese día andaba con él, aclarando que se refería al apelante.

El fiscal renunció a un tercer testigo como prueba acumulativa y quedó a disposición de la defensa. Este testigo era la esposa de Ismael Travieso, dueño del negocio. Con eso quedó terminada la prueba de cargo.

El primer testigo de defensa fue el testigo renunciado por el fiscal, Sra. Teresa Carrasquillo Pagán, esposa del dueño del negocio. La noche de la muerte estaba en el negocio desde temprano. Vio en el mismo al apelante y a unos cuantos, entre ellos a Carlos Enrique Santiago quien llegó allí por primera vez. No sabe a que hora llegó éste pero no llevaba un rato allí. Al llegar Santiago le dijo a este señor: "Te vendo este revólver." Santiago llegó al negocio con un revólver y salió a vendérselo al acusado. Identificó el arma que quedó admitida en evidencia como el revólver que llevó allí Santiago. Al ofrecérselo en venta al acusado sabe que lo cogió en la mano y lo miraba. No sabe nada más.

Contrainterrogada por el fiscal reafirmó haber visto el arma en manos del otro señor y luego en manos del apelante. Cuando la testigo estuvo atendiendo el negocio no estaba allí la víctima. Oyó el disparo desde su casa. Cuando salió del negocio no sabe quien tenía el arma, "cuando ese señor dijo, 'te vendo el revolver', yo no sé si él lo tenía, pero él lo cogió en la mano."

El apelante ocupó la silla de testigos. Declaró ser barbero, casado con dos hijos. Sobre los hechos ocurridos su declaración total fue la siguiente: (R. págs. 37–38)

"R—Bueno, yo me estaba dando una cerveza en el bar; entonces, luego llegó Quique Santiago. Entonces, me dijo que tenía un revólver para venderlo. Yo le dije que yo no compraba eso.

P.—Y qué pasó? El le mostró el revólver a Ud.?

R.—Sí, señor.

P.—Y qué pasó?

R.—Bueno, luego llegó, esto, el difunto, ¿ve? y nos sentamos a tomarnos un par de cervezas. Carlos Enrique Santiago le dijo que si compraba el revólver al difunto. El difunto dijo que le permitiera ver. Carlos Enrique, según yo vi que le sacó las balas; luego no se las vi sacar al difunto o si no se las sacó, la bala lo cogió a él.

P.—Se le salió un tiro?

R.—Sí, señor.

P.—Ud. tuvo en algún momento intención de matar este señor Alberto?

R.—No, señor.

P.—Era amigo suyo?

R.—Sí, señor.

P.—Qué tiempo hacía que conocía a Alberto Benítez?

R.—Como dos años más o menos.

P.—Diga la exclamación suya cuando salió el tiro, qué fue lo que Ud. dijo?

R.—Yo dije, 'Dios mío, qué yo he hecho', pero no me pude dar cuenta más· después porque yo creo que perdí el conocimiento.

P.—Después de eso, de esa exclamación, y no sabe más nada porque Ud. cree que perdió el conocimiento?

R.—Sí, señor.

P.—Pues, nada más."

Repreguntado por el fiscal: (R. págs. 39–41)

"Ud. dice que se le salió el tiro, se le zafó el tiro?

R.—Para el concepto mío, el revólver estaba vacío.

P.—La pregunta mía es si se le salió el tiro.

R.—Sí, señor.

P.—Cómo se salió ese tiro?

R.—No podría explicarle.

P.—No puede explicarlo. Ud. no le apuntó a Alberto Benitez a la cabeza? Eh?

R.—Bueno, esto . . .

P.—Que si le apuntó o no le apuntó.

R.—Bueno, no le apunté, no.

P.—No le apuntó para su concepto y para su concepto tampoco haló el gatillo, ¿eh?

R.—Para mi concepto, sí, lo fué.

P.—Haló el gatillo?

R.—Sí, señor.

P.—Oiga, para qué haló el gatillo?

R.—Yo creía que estaba vacío.

P.—Ud. creía que estaba vacío pero no le apuntó a la cabeza?

R.—En condiciones de matarlo, no le apunté.

P.—No le apuntó. Dígame, con qué intención le apuntó, si le apuntó?

R.—Con ninguna intención.

P.—No le apuntó? No le apuntó?

R.—Le apunté pero no en condiciones de matarlo.

P.—Le apuntó y haló el gatillo?

R.—Pero para los efectos míos, estaba vacío.

P.—Para los efectos suyos estaba vacío. Ud. no le dio por mirar al revólver a ver si estaba vacío o no estaba vacío?

R.—Nunca en mi vida había cogido un revólver.

P.—La pregunta es si no miró para ver si estaba vacío o no estaba vacío?

R.—No, señor.

P.—Pero lo cierto es que salió de alli corriendo?

R.—Histérico, sí, señor.

P.—Histérico. Se le parece a éste el revólver?

R.—No me fijé bien porque yo estaba bastante tomado.

P.—Ud. estaba bastante tomado?

R.—Tomado.

P.—Dígame, y cuánto tiempo hacía que Ud. llevaba en el negocio?

R.—Alrededor de, como 2 horas.

P.—Llegó allí tomado ya?

R.—Sí, llegué.

P.—Ah?

R.—Sí, iba tomado.

P.—Dígame si es o no cierto que Ud. también dijo que 'esta noche hago yo una de las mías,'?

R.—No, señor.

P.—No dijo eso?

R.—No, señor.

P.—Nada más con el testigo.

LA DEFENSA: Dígame, testigo, una sola pregunta: Ud. llegó al negocio con ese revólver?

R.—No, señor.

EL FISCAL: Yo acepto que no llegó con él, que estaba vendiéndolo el otro.

P.—No lo portaba sobre su persona como dice la denuncia?

R.—No, señor.

LA CORTE: Puede retirarse, volver a su asiento. Ese es el caso de la defensa?

LA DEFENSA: Ese es nuestro caso, Vuestro Honor".

## —II—

En apoyo del recurso, la Sociedad para Asistencia Legal hizo el siguiente señalamiento de errores:

*"PRIMER ERROR*: Erró el tribunal en sus instrucciones al jurado:

i. Al instruir contrario a lo dispuesto por este tribunal en el caso de *Pueblo vs. Natal Rojas,* 93 D.P.R. 844.

ii. Al no instruir sobre el efecto de la embriaguez en el delito de asesinato.

iii. Al no instruir sobre la posibilidad de traer un veredicto de homicidio involuntario.

iv. Al no instruir, según la solicitud de la defensa, sobre la posibilidad de portación incidental.

*SEGUNDO ERROR*: La prueba del Pueblo no estableció el delito de infracción a los artículos 8 y 6 de la Ley de Armas por el apelante.

*TERCER ERROR*: El efecto acumulativo de los errores señalados privaron al apelante de un debido proceso de ley."

1. La Sala sentenciadora instruyó al jurado: (R. pág. 55)

"En este caso el acusado ha declarado, él ha ocupado el sitial de los testigos y, por tanto, su testimonio debe ser tomado en consideración como el de cualquier otro testigo, *teniendo, desde luego, en cuenta el interés que todo acusado tiene en su propia causa."* (Énfasis suplido.)

■ En *Pueblo* v. *Natal Rojas,* 93 D.P.R. 844 (1967), repudiamos, con efecto prospectivo, la parte enfatizada de esta instrucción. Posteriormente, al manifestarnos sobre el particular, hemos expresado criterio también sobre si dicha instrucción, a la luz de los hechos de esos casos, ha causado o no fundamental perjuicio. Cf. *Pueblo* v. *Dávila Peña,* Sentencia de 29 de febrero de 1968; *Pueblo* v. *Dávila Quiñones,* Sentencia de 29 de marzo de 1968.

La instrucción en este caso fue dada el 14 de febrero de 1967, con posterioridad a nuestra decisión en *Natal Rojas,* emitida el 16 de enero de 1967.

En las circunstancias presentes en que, en cuanto a aspectos esenciales, la única prueba fue suplida por el propio apelante a través de su testimonio, la instrucción pudo haber tenido influencia perjudicial. En vista, sin embargo, de la disposición del recurso, no es necesario que entremos en posteriores consideraciones, ya que en un nuevo juicio la instrucción rechazada en *Natal Rojas* obviamente no será transmitida al jurado.

■ 2. A la luz de los hechos en el récord no resultaría error perjudicial el dejar la Sala sentenciadora de instruir al jurado sobre el efecto de la embriaguez. Art. 41 Código Penal. Si bien se imputó la comisión de un delito de asesinato en 1er. grado, que requiere la intención específica de matar, deliberadamente, la convicción fue de 2do. grado, que sólo requiere malicia premeditada. La falta de dicha instrucción no impedía que el jurado, de darle crédito, tomara en cuenta, junto a todos los demás hechos y circunstancias, que el apelante estaba tomando cerveza.

■ 3. Fue error sustancial, a la luz del récord, no instruir al jurado sobre un veredicto de homicidio involuntario. Instruyó la Sala:

"Dentro de una acusación por el delito de asesinato, el Jurado puede declarar al acusado culpable de un delito de homicidio. . . .

El homicidio es de dos clases: voluntario, cuando ocurre con ocasión de una súbita pendencia o arrebato de cólera e involuntario, cuando ocurre al realizarse un acto ilegal que no constituyere delito grave, (1) o al realizarse un acto legal que pudiera ocasionar la muerte en forma ilegal, o sin la debida prudencia o circunspección."

Excepto la anterior definición estatutaria, no se dio más información al jurado pertinente a un homicidio involuntario. Además, la Sala sentenciadora expresamente dispuso que a la luz de los hechos que vieron desfilar, los únicos veredictos que podría traer el jurado eran los de asesinato en primer grado, asesinato en segundo grado y homicidio voluntario, en caso de que creyeran que se había cometido un delito. El tribunal no les permitió considerar y traer un veredicto de homicidio involuntario.

El Procurador General se allana a que se revoque la convicción de asesinato en segundo grado por el defecto señalado en las instrucciones y a que se conceda un nuevo juicio. El Procurador General tiene razón, así como la defensa. La prueba en el récord, aparte de la credibilidad que el jurado pudiera darle, requería una instrucción de homicidio involuntario como uno de los posibles veredictos, de hallarse culpable al apelante—Regla 137 Proc. Cr. 1963. *Pueblo* v. *Burgos,* 76 D.P.R. 199 (1954); *Pueblo* v. *Del Valle,* 91 D.P.R. 174 (1964); *Pueblo* v. *Tufiño Cruz,* 96 D.P.R. 225 (1968); *Pueblo* v. *Alsina,* 79 D.P.R. 46 (1956); *Pueblo* v. *Rosado,* 78 D.P.R. 436 (1955); *Pueblo* v. *Rodríguez Dapena,* 35 D.P.R. 431 (1926); *Pueblo* v. *Fernández,* 49 D.P.R. 586 (1936).

■ 4. En cuanto a la solicitud de la defensa sobre una instrucción de portación incidental, el récord demuestra lo siguiente: (R. 56–57)

(1) Disparar o apuntar armas de fuego, sin malicia, aunque intencionalmente, es delito *menos grave* bajo el Art. 32 de la vigente Ley de Armas de 1951. Apuntar, como acometimiento grave, igualmente es delito menos grave.

(Juez) "Hay alguna instrucción especial?

LA DEFENSA: Vuestro Honor, se hizo entrega al Secretario.

EL FISCAL: Yo me opongo a esa instrucción, Su Señoría, porque aquí . . . .

LA CORTE: Todavía no la he leído. Primero que está escrita en manuscrito y yo no tengo que atender ninguna instrucción manuscrita. Tiene que estar a máquina. (²) El Jurado me hará el favor de pasar al salón del Jurado.

Hágala a máquina y notifique al Fiscal.

(Se retira el Jurado)

LA CORTE: Entonces, cuál es la situación? Hay unas instrucciones especiales. Instrucciones especiales de la defensa. Instrucciones sobre en qué consiste la portación de armas incidental. En Humacao, P.R.

Qué dice el Fiscal? Quiere decir algo?

EL FISCAL: Yo digo que esa instrucción no procede porque no hay base en la prueba que se ha presentado para concluir que se debe dar esa instrucción.

LA DEFENSA: Me permite el Tribunal expresarme?

LA CORTE: Sí, cómo no.

LA DEFENSA: Hay prueba de que este señor le entregó este revolver alli mismo, que no estaba portándolo, que lo llevó en el momento mismo y que se lo entregó a él.

LA CORTE: El Tribunal estima de acuerdo con la prueba que se lo entregó en el mismo acto, se lo entregó momentos antes del acto y que después ocurrió el acto. No procede dicha instrucción. Se declara sin lugar. Póngala ahí mismo a los efectos futuros."

Al allanarse a la revocación en cuanto a la convicción de asesinato, el Procurador General expresó ser innecesario discutir los demás planteamientos del apelante. Este error, sin embargo, se relaciona con la otra convicción por el jurado del delito de portar y conducir un arma cargada.

---

(²) La Regla 137 de Procedimiento Criminal de 1963 de su faz no lo exige. Dispone que cualquiera de las partes podrá presentar al Tribunal "una petición *escrita*" de que se den determinadas instrucciones, con copia a la parte contraria.

■ A la luz de los hechos en el récord y aparte de la credibilidad que el jurado pudiera dar a la prueba, era de rigor que la Sala sentenciadora lo instruyera sobre portación incidental de un arma de fuego, a tenor de las normas de derecho sentadas por este Tribunal sobre una portación incidental. *Pueblo* v. *Moll*, 28 D.P.R. 783 (1920); *Pueblo* v. *Correa*, 36 D.P.R. 440 (1927); *Pueblo* v. *Borges*, 23 D.P.R. 524 (1916); *Pueblo* v. *Arana*, 72 D.P.R. 821 (1951); *Pueblo* v. *Suazo*, 65 D.P.R. 28 (1945); cf. *Pueblo* v. *Cruz Collazo*, 95 D.P.R. 651 (1968).

Tal instrucción fue expresamente solicitada por la defensa y denegada. La denegatoria fue un error perjudicial, particularmente ante esta otra instrucción de la Sala al jurado—(R. pág. 50)—al efecto de que:

. . . "la persona que *use* un revólver cargado, aunque se lo hayan entregado un solo instante antes de salir la bala, eso es suficiente para condenar a una persona del delito de portar un arma de fuego cargada."

Con esta instrucción, y en ausencia de la otra, el jurado tuvo que concluir por el solo hecho de que el apelante disparó un arma, conforme al crédito que le dio a la prueba de cargo, que ello lo hacía también culpable de portarla y conducirla.

La anterior instrucción, y la negativa de instruir sobre portación incidental, requieren igualmente la revocación de la sentencia de portación de armas, Art. 8 de la Ley, y la concesión de un nuevo juicio.

En su segundo señalamiento de error el apelante sostiene que la prueba no estableció el delito de infracción a los Arts. 8 y 6 de la Ley de Armas. Ya dispusimos lo referente al Art. 8. En lo que respecta a la infracción del Art. 6, este artículo dispone que:

"Toda persona que tenga o posea cualquier pistola, revólver, y otra arma de fuego *sin tener licencia para ello expedida como más adelante se dispone,* será culpable de delito menos grave. . . ." (Énfasis suplido.)

La forma de expedir la licencia está pormenorizada en los artículos siguientes de la Ley:—solicitud jurada en formulario suplido por el Jefe de la Policía, investigación, cualidades del solicitante, toma de huellas digitales, etc.—Arts. 16, 17, 18, 19, Ley.

■ El fiscal admitió en el curso del proceso—(R. *ante*) —que el apelante no llegó al negocio con el revólver, que estaba vendiéndolo el otro. La propia Sala sentenciadora— (R. 57)—concluyó:

"El Tribunal estima de acuerdo con la prueba que se lo entregó [el revólver] en el mismo acto, se lo entregó momentos antes del acto y que después ocurrió el acto."

Nada en contrario hay en el récord que desvirtúe ni la admisión del fiscal, ni la anterior conclusión *de hecho* de la Sala.

Sin detenernos ahora a analizar el concepto de *tenencia y posesión* del Art. 6 de la Ley de Armas, en los hechos probados de este caso el Art. 6 no tiene aplicación. El Legislador no contempla lo ilógico ni lo imposible. El delito castigado en el Art. 6 no es tener o poseer un arma de fuego, sino el tenerla o poseerla *sin tener licencia para ello expedida en la forma dispuesta en el estatuto.* Bajo los hechos probados, el apelante no tenía la obligación de inscribir.

No siendo aplicable a los hechos en el récord el Art. 6 de la Ley de Armas de 1951, no puede prevalecer la convicción por el tribunal de derecho de esta infracción.

*En consecuencia de lo aquí expresado, se revocarán las sentencias condenatorias en los casos de asesinato en segundo grado y conducción y portación de revólver cargado (Art. 8) y se concederá un nuevo juicio en esas causas. Se revocará la sentencia condenatoria en el caso de infracción al Art. 6 de la Ley de Armas y se absolverá al apelante en esta causa.*

El Juez Asociado Señor Blanco Lugo disintió en lo que respecta a la infracción del Art. 6 de la Ley de Armas. El Juez Asociado Señor Ramírez Bages disintió en opinión se-

parada en la cual concurre el Juez Asociado Señor Torres Rigual en lo que respecta a la infracción del Art. 6 de la Ley de Armas.

—O—

Opinión disidente del Juez Asociado Señor Ramírez Bages en la cual concurre el Juez Asociado Señor Torres Rigual

San Juan, Puerto Rico, a 16 de diciembre de 1968

Disiento de la conclusión contenida en la opinión del tribunal al efecto de que no es aplicable el Art. 6 de la Ley de Armas de 1951 a los hechos en el récord del caso pues "Bajo los hechos probados el apelante no tenía la obligación de inscribir."

En este caso hubo en realidad una tenencia o posesión accidental de un arma de fuego sin licencia para ello. La Ley de Armas no excluye expresamente del requisito de tal licencia la tenencia o posesión accidental. Por el contrario, claramente se deduce de sus distintas disposiciones que el propósito primordial del legislador es el proscribir la tenencia o posesión de un arma de fuego sin licencia en forma drástica y siendo esta legislación de orden público, debe ser objeto de estricta interpretación. *Cooke* v. *United States*, 275 F.2d 887 (D.C. Cir. 1959). Así vemos que el traficante en armas no puede vender un arma de fuego a nadie *sin asegurarse que tal persona tiene una licencia para tener o poseer un arma*. Puede comprar un arma de fuego inscrita de la persona que la tuviere inscrita *siempre que tal persona tuviere licencia* para tener y poseer dicha arma de fuego. Si no cumple con estos requisitos incurre en un delito menos grave (25 L.P.R.A. secs. 432(d) y 438). Por el Art. 29(k) (25 L.P.R.A. 439(k)), se dispone que si falleciere una persona que posea una licencia para tener o poseer un arma de fuego, el albacea deberá notificar del hecho al Jefe de la Policía. Éste dispondrá lo necesario para la custodia de dicha arma y si ésta le fuera adjudicada a uno de los herederos

*se le entregará a dicho adjudicatario si se le expidiere licencia.* Además, la persona que posea licencia para tener arma de fuego, y quiera deshacerse del arma sólo puede hacerlo de dos maneras, o vendiéndola a un comerciante autorizado; o entregándola a la Policía.

No obstante, se ha resuelto que una tenencia o posesión accidental sin licencia, es excusable cuando la misma es con un propósito legal, como el haber encontrado el arma y llevarla con el fin de entregarla a la policía o cuando resulta de haber desarmado a uno que la posee ilegalmente. *People* v. *Furey*, 217 N.Y.S.2d 189 (1961). La tardanza en tramitar la policía la solicitud de una licencia no excusa el tenerla o poseerla sin licencia. *People* v. *Weisman*, 229 N.Y.S. 2d 171 (1962). En el caso ante nos, no tan solo no surgió circunstancia alguna que hiciera excusable la tenencia o posesión del arma, sino que, por el contrario, indudablemente el apelante apuntó con el revólver a la cabeza del occiso y apretó el gatillo con motivo de lo cual disparó el revólver y causó la muerte del ser humano al cual apuntaba. A los efectos de la infracción, era inmaterial que creyera que el revólver estaba descargado, pues la intención criminal no es un ingrediente esencial del delito en cuestión, necesitándose solamente la intención de cometer el acto proscrito, es decir, la tenencia del arma sin licencia.

A mi juicio, el tribunal ha debido confirmar la convicción del apelante por la infracción del Art. 6 de la Ley de Armas.