EL PUEBLO DE PUERTO RICO, apelado, *v.* ERICK S. NAZARIO HERNÁNDEZ, acusado y apelante.

*Número:* CR-93-36          *Resuelto:* 29 de junio de 1995

*Pedro A. Otero Fernández*, abogado del apelante; *Pedro A. Delgado Hernández, Procurador General*, abogado de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal Supremo.

Evaluamos importantes aspectos de nuestro derecho probatorio, así como reafirmarmos el principio de que el derecho a contrainterrogar —como parte del derecho constitucional a una confrontación— no conlleva ínsitamente una garantía de obtener un fallo o veredicto absolutorio.

I

En el Tribunal Superior, Sala de San Juan, Erick S. Nazario Hernández fue acusado de conducir en estado de embriaguez —Sec. 5-801 de la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 1041— y causar la muerte del policía Eladio Rivera Osorio por imprudencia crasa o temeraria. Art. 87 del Código Penal, 33 L.P.R.A. sec. 4006.

La prueba de cargo creída por el Jurado estableció que el 30 de junio de 1990, poco después de las dos de la mañana (2:00 A.M.), mientras Nazario Hernández conducía un vehículo marca Acura hacia Bayamón por el expreso De Diego (Carr. Núm.22), a exceso de velocidad y en estado de

embriaguez (mínimo 0.16%), arrolló al policía Rivera Osorio, quien murió de forma instantánea.

En consecuencia, el Jurado lo halló culpable de homicidio involuntario (Art. 86 del Código Penal, 33 L.P.R.A. sec. 4005) y de conducir en estado de embriaguez. El Tribunal (Hon. Elpidio Batista Ortiz, Juez) sentenció al señor Nazario Hernández a tres (3) años de reclusión por el homicidio involuntario y a treinta (30) días por la infracción a la Ley de Vehículos y Tránsito de Puerto Rico.

En apelación, el acusado presentó como errores[1] que dicho foro no excusó —con motivos— a unos jurados; admitió prueba de referencia; se negó a admitir una prueba determinada, y lo encontró culpable más allá de duda razonable sin suficiente prueba.[2] Expongamos sucintamente la prueba en sus extremos pertinentes a tales señalamientos.

El policía *Benjamín Pérez Mártir* declaró que el 30 de junio de 1990, como a las dos de la mañana (2:00 A.M.), luego de concluir su jornada de trabajo, en unión a Rivera Osorio regresaban a sus respectivos hogares por el expreso De Diego, en dirección a Bayamón. Iban uniformados, en motoras y con sus biombos encendidos. Cerca del Km. 4.1 vieron un Honda detenido en el segundo carril, de derecha a izquierda, completamente apagado y sin luces. Se detuvieron para investigar. Dentro del Honda había un hombre. Rivera Osorio estacionó en el paseo su motora con el biombo encendido y Pérez Mártir la suya detrás del aludido vehículo para alumbrarlo. *Ambos tenían puesto el cinturón lumínico que brilla en la oscuridad.* T.E., Vol. I, págs. 9–12.

Pérez Mártir se dirigió al vehículo por el lado del conductor y Rivera Osorio por el derecho. Pérez Mártir inter-

---

[1] Oportunamente los evaluaremos en el orden lógico como se desarrolló el proceso judicial.

[2] La prueba testifical fue abundante y su transcripción consta de quince (15) volúmenes.

ᴸvino con el conductor (Richard W. Millier), quien estaba dormido, se despertó asustado, encendió el vehículo y lo movió un poco hacia el frente. Entonces, Rivera Osorio se dirigió hacia el lado del conductor y Pérez Mártir se ubicó detrás del vehículo. Arribaron los agentes uniformados Víctor López Sánchez y José Alequín Cruz, que pasaban por allí y estacionaron su patrulla al otro lado de la carretera, esto es, hacia San Juan. El agente López Sánchez fue hacia donde estaba Rivera Osorio y el agente Pérez Mártir se quedó detrás del Honda estacionado. López Sánchez y Rivera Osorio sacaron al conductor del Honda, mientras que Pérez Mártir dirigía el tránsito.

López Sánchez llevó al conductor Millier detrás del vehículo. Mientras Rivera Osorio cerraba la puerta del Honda, un vehículo marca Acura color rojo, que iba a *velocidad exagerada*, lo impactó, a pesar del esfuerzo que hizo López Sánchez para impedirlo al tomarlo por el brazo. Rivera Osorio murió en el acto.

El auto marca Acura no se detuvo. Fue seguido por el policía Alequín Cruz, y entonces su conductor —el aquí apelante Nazario Hernández— retrocedió al lugar de los hechos y fue arrestado por el policía López Sánchez. Después llegó el Sgto. José Febres García, quien se hizo cargo de dirigir la investigación. La prueba de alcohol de Nazario Hernández reveló un .17%.

El policía Pérez Mártir aclaró que el Acura iba a alta velocidad cuando impactó a su compañero, cuyo cuerpo salió expulsado y dio vueltas en el aire antes de caer al pavimento a unos doscientos (200) pies. T.E., Vol. I, págs. 23–25. El Acura siguió y luego lo vio "retroceder en forma de zig zag". Íd., pág. 26. Dicho vehículo quedó con el cristal delantero roto y parte del bonete hundido. Asimismo, que vio cuando el agente López Sánchez intervino y sacó al acusado del vehículo. Íd., pág. 28. El acusado no se podía mantener casi en pie y, además, lo oyó hablar "incoheren-

temente, incoherente, [con] la lengua muy pesada". Íd., pág. 29. Luego identificó unas fotografías. Íd., págs. 31–36.

En el *contrainterrogatorio*, Pérez Mártir explicó que, aunque no habló personalmente con el acusado, lo vio allí hablando con otras personas. T.E., Vol. I, págs. 80 y 88. Reiteró que al retroceder después del impacto y de la fuga inicial, lo hizo en forma de "zig zag". Íd., pág. 104. Lo oyó hablar con un policía. T.E., Vol. II, págs. 22–23. Además, quedaron admitidas unas fotografías como evidencia demostrativa ilustrativa. Íd., págs. 28–38. En el redirecto reiteró varios extremos.

El *policía López Sánchez* declaró sobre su entrenamiento para detectar a personas en estado de embriaguez y cómo opera la máquina *Intoxilyser*, Modelo 4011-A. T.E., Vol. V, págs. 54–58. Éste, en la madrugada de los hechos, iba en una patrulla en unión a Alequín Cruz cuando notaron la intervención de dos (2) policías motoristas con un vehículo estacionado en el expreso De Diego; eran Pérez Mártir y Rivera Osorio. Sus motoras tenían los biombos encendidos. Íd., págs. 60–61. Se detuvieron a auxiliarlos. Vio al vehículo marca Acura que venía a alta velocidad —unas setenta (70) a ochenta (80) millas por hora— e infructuosamente intentó agarrar a Rivera Osorio para evitar el impacto. Íd., págs. 62–66.

Describió dicho impacto, cómo el acusado siguió y luego dio reversa. T.E., Vol. V, pág. 66. El Acura quedó abollado y con el cristal delantero roto. Íd., págs. 68–69. Intervino y arrestó al acusado, le hizo las "advertencias" y lo entregó al Sargento Febres García, quien arribó unos minutos después. Íd., pág. 69. Febres García instruyó para que lo llevara a la estación de Buchanan y le practicar la prueba de aliento, debido a que se le notaban los ojos rojizos. Lo montó y trasladó en la patrulla a la estación. Íd., pág. 73. Allí le hizo la prueba de aliento (íd., págs. 126–133), que arrojó un .17% de alcohol (íd., pág. 133).

En el *contrainterrogatorio*, el policía López Sánchez reiteró que las motoras tenían los focos encendidos (T.E., Vol. VIII, págs. 38–41); que, luego del impacto, el acusado retrocedió en "zig zag" (T.E., Vol. IX, pág. 12), y que tenía los ojos rojizos (íd., pág. 34).

En el *redirecto*, el testigo repitió el resultado del examen de aliento que fue .17% (íd., pág. 47) y lo que le había dicho al sargento Febres García sobre los hechos (dónde y cómo se produjo el impacto). Íd., pág. 57. En el *recontrainterrogatorio* se expresó sobre lo que le dijo al sargento Febres García. Íd., págs. 80–86.

El *sargento Febres García* declaró que se hizo cargo de la investigación al llegar a la escena minutos después. Encontró el cadáver de la víctima destrozado en el pavimento, en el tercer carril de derecha a izquierda. T.E., Vol. II, pág. 102. Al interrogar al acusado sobre sus datos personales, percibió un fuerte olor a licor en su aliento. Íd., pág. 109. Analizó la escena para hacer un croquis (íd., pág. 113) y describió el *debris* y su distancia del cadáver (íd., págs. 118–123). El croquis fue preparado por José Martínez Bonilla, agente que sabía dibujar siguiendo sus instrucciones. Íd., págs. 123–127.

El sargento describió la escena (íd., págs. 33–39) y se refirió al cinturón lumínico que usaba la víctima al ser impactado (íd., págs. 39–45). Explicó el propósito del biombo encendido en las motoras policíacas (íd., pág. 45) y el casco protector que usaba la víctima (íd., pág. 46).

En el *contrainterrogatorio*, Febres García aludió a las personas que le dieron la información que se utilizó para preparar el croquis, entre ellos los agentes López Sánchez y Pérez Mártir. T.E., Vol. IV, pág. 24. Declaró sobre el cinturón lumínico (T.E., Vol. V, págs. 7–8) y explicó que el hecho de que una motora trabaje ocho (8) horas no implica que tienda a padecer de la batería (íd., págs. 29–30). En el *redirecto* y *recontrainterrogatorio*, entre otros extremos,

volvió a declarar sobre dicho *debris* y la distancia entre el lugar del impacto. Íd., págs. 41–54.

*Migdalia Fernández Martínez*, en el *directo* y en su capacidad de *química*, declaró sobre las características del *Intoxilyser* (T.E., Vol. X, págs. 70–71), que estaba encargada de certificar su buen funcionamiento (íd., págs. 71–72) y, en específico, la máquina 4011A (íd., pág. 73). Explicó la confiabilidad de la prueba (íd., pág. 75) y mencionó la certificación de la máquina usada para la prueba de aliento del acusado (íd., págs. 76–88). En el *contrainterrogatorio*, ella declaró sobre su preparación, experiencia y credenciales como perita. Confrontada con un artículo por la defensa, expuso su posición al respecto. En el *redirecto* explicó que el margen de error en la prueba de alcohol hecha al acusado (que dio .17%) era de .01 hacia arriba o hacia abajo, por lo que el resultado pudo haber sido .18% o .16%. T.E., Vol. XI, pág. 57. En cuanto al porcentaje de alcohol en la sangre al momento del accidente, aproximadamente una hora antes de la prueba, indicó que pudo haber tenido .18% o .16%. Íd., pág. 69.

La *patóloga Ofelia G. Vera* declaró sobre los hallazgos de la autopsia de la víctima. T.E., Vol. XI, págs. 87–95. En éste no había rastros de drogas ni de alcohol. Íd., págs. 93–95. El cuerpo dio primero con el parachoques (*bumper*) y bonete del carro y luego con el pavimento. Íd., págs. 94–95. Por la localización de las fracturas, infirió que no hubo un frenazo. Íd., págs. 99–100. También identificó unas fotografías. Íd., págs. 102–115.

En el *contrainterrogatorio*, la patóloga reafirmó que las fracturas eran compatibles con un impacto *sin* frenazos. T.E., Vol. XI, pág. 118. En el *redirecto*, indicó que sus hallazgos no hubieran sido distintos por el hecho de que hubiera un arma en la escena. Íd., pág. 121. En el *recontrainterrogatorio*, ella declaró que las lesiones en la cabeza fueron debidas al tercer impacto, esto es, con el pavimento.

Íd., pág. 126. Indicó que no creía que la víctima hubiese dado con el casco al cristal, sino que fue su cuerpo, aunque era posible que fuera con el casco o con el cuerpo. Íd., págs. 128–129. Su opinión era que fue con el cuerpo. Íd., pág. 130. La víctima no tenía el casco al caer al pavimento. Íd., pág. 132. La patóloga opinó que la víctima impactó el cristal con el casco puesto y cayó al pavimento sin el casco. Íd., pág. 136.

El *policía Jesús Ortiz McCormick* declaró para autenticar, mediante el mecanismo de la cadena de custodia, cierta evidencia demostrativa perteneciente a la víctima: el casco, el *sand bown* y el cinturón luminoso. Íd., págs. 23–40. Durante el *contrainterrogatorio*, se reafirmó sobre la autenticación de esa evidencia demostrativa. Íd., págs. 41–59. Se admitió con una instrucción al Jurado sobre la pertinencia condicionada; después hubo un corto *recontrainterrogatorio*. Íd., págs. 66–67.

La esposa de la víctima, *Sra. María Reyes*, en lo esencial, aclaró que su esposo era derecho, no zurdo. T.E., Vol. IV, págs. 14–15.

*Por la defensa declararon seis (6) testigos. Elba Santiago Morales*, custodio de vehículos en poder del Gobierno, declaró, en lo pertinente, que los frenos del Acura estaban en perfectas condiciones. T.E., Vol. XII, pág. 27.

*Richard Negrón Vélez*, policía de tránsito adscrito a Buchanan, testificó sobre las horas de entrada y salida de los agentes López Sánchez y Alequín Cruz la noche de 29 de junio, amanecer de 30 de junio de 1990. López Sánchez rindió "con novedad"(³) a las 5:15 A.M.

*José Anaya Nieves* declaró sobre los expedientes de las motoras de los policías Rivera Osorio y Pérez Mártir. Señaló que estaban en buenas condiciones, al igual que sus biombos. La norma imperante era tener las motoras en

---

(³) En el argot policíaco, "con novedad" se refiere a la situación que se suscita cuando un policía tiene que laborar sobre el límite de ocho (8) horas en un día debido a algún incidente o problema que así lo requiera. T.E., Vol. XII, pág. 32.

óptimas condiciones durante los turnos nocturnos. T.E., Vol. XII, pág. 82. Luego del accidente, las motoras estaban intactas. Íd., pág. 84.

*Jorge L. Simons Herrera*, agente a cargo de la custodia de los expedientes de las motoras, declaró que una motora con su biombo dañado no salía de noche a la calle. T.E., Vol. XII, pág. 115 al final.

*José A. López Nieves*, investigador forense del Instituto de Ciencias Forenses, fotografió la escena. No recibió instrucciones del sargento Febres García. T.E., Vol. XII, págs. 126–127. *La iluminación del sitio de los hechos era buena.* Íd., pág. 128. Declaró, sobre el croquis, que no vio diferencia significativa alguna entre dicho croquis y las fotografías que tomó. Íd., págs. 135. También fotografió una motora con las luces encendidas. Íd., pág. 139.

El juez que presidió la vista preliminar en el caso, *Hon. Carlos Rivera Martínez*, testificó sobre los testimonios de Pérez Mártir (T.E., Vol. XIII, págs. 7–9) y de López Sánchez (íd., págs. 9–11). En el *contrainterrogatorio* señaló que esos testimonios fueron a los efectos de que el automóvil del acusado, al momento del accidente, venía entre setenta (70) y ochenta (80) millas por hora. Íd., págs. 11–15.

En la refutación (*rebuttal*), el Fiscal presentó a *Raúl Mercado Rodríguez*. Atestó ser agente de la división de tránsito adscrito a Buchanan, a cargo de los expedientes de análisis de aliento. T.E., Vol. XIII, pág. 26. En el *contrainterrogatorio* explicó con claridad los errores levantados por la defensa. Íd., págs. 55–67. En el *redirecto*, abundó en lo mismo. Íd., págs. 72–75. *Ricky Burgos*, alguacil de sala, declaró sobre las gestiones para citar al policía Mercado Rodríguez, testigo anterior. *Jesús Ortiz McCormick*, policía que había declarado como testigo de cargo, aclaró que no había hablado o almorzado con el policía Mercado Rodríguez.

Tras incidentes sobre unos documentos, el tribunal permitió al Fiscal presentar, como testigo adicional de refuta-

ción, a *Ricardo Bonet Font*, persona a quien le hicieron un análisis de aliento inmediatamente después del realizado al acusado.

Con vista a esta sucinta relación de los testimonios orales, examinemos los señalamientos de error:

## II

*SEXTO ERROR*: Incidió ... [el] Tribunal [a quo] al no excusar motivadamente a jurados que entendían en contra de la presunción de inocencia que el acusado debía sentarse a declarar y cuando menos a señalar su omisión. Alegato, pág. 32.

Se queja el apelante Nazario Hernández de que el tribunal no excusó "motivadamente dos o tres jurados que requerían que el acusado diese una explicación". Alegato, pág. 32.

Sobre este extremo, notamos que no gestionó, como le correspondía, la transcripción del proceso de selección del Jurado; sólo nos dice que "al transcribirse la evidencia esta parte no fue transcrita". Alegato, pág. 33. *No es suficiente.*

En lo sustantivo, no invoca ninguno de los fundamentos de la Regla 121 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, para una recusación motivada válida. Asumiendo que unos jurados expresaron que consideraban que el acusado debía declarar, también hemos de presumir que, una vez instruidos por el Juez, se aclararon y superaron cualesquiera dudas al respecto.

No podemos olvidar que los jurados son ciudadanos comunes que, como regla general, no conocen con exactitud las disposiciones y normas constitucionales y evidenciarias que entran en juego en los procesos penales. Precisamente ello explica la necesidad de ilustrarlos en su misión, a través de las instrucciones. En *Pueblo v. Jiménez Hernández*, 116 D.P.R. 632, 636 (1985), una de las candidatas al Jurado manifestó que tomaría en consideración el

silencio del acusado durante el proceso y que ella prefería escuchar su testimonio para poder decidir. Allí reiteramos a *Pueblo v. Montañez*, 54 D.P.R. 852 (1939), a los efectos de que "no abusa de su discreción un tribunal que deniega una recusación motivada, basada meramente en la expresión de un candidato a jurado, demostrativa la misma de que el candidato en ese momento desconocía un principio legal". *Pueblo v. Jiménez Hernández*, supra, pág. 636. Además reconocimos que, de ordinario, los candidatos a jurados "son personas legas que no tienen noción alguna de los principios legales vigentes en nuestra jurisdicción". Íd. Con vista a esa realidad, rechazamos la visión que tiende a equiparar el proceso de selección del Jurado con un examen de reválida al que deben ser sometidos los candidatos.

Lo verdaderamente decisivo es que se brinden las instrucciones adecuadas sobre los principios legales correspondientes y la disponibilidad de los jurados de seguirlos y aplicarlos. Advertimos que el apelante Nazario Hernández no cuestiona la suficiencia de las instrucciones del tribunal al Jurado sobre su derecho a no declarar y sobre los otros extremos cubiertos en dichas instrucciones. *El error no fue cometido.*

III.

*PRIMER ERROR*: Admitir prueba de referencia sobre prueba de referencia en relación con ciertas piezas de evidencia ofrecidas por la Hon. Fiscal. Alegato, pág. 4.

En este señalamiento el apelante Nazario Hernández, con vista a una relación y unos segmentos de los testimonios de los policías Pérez Mártir, López Sánchez y el sargento Febres García, elabora la tesis de que el tribunal incidió al admitir el croquis de la escena del suceso y unas fotografías, "por ser prueba de referencia sobre prueba de referencia"; esto es, prueba de referencia múltiple. Regla 66 de Evidencia, 32 L.P.R.A. Ap. IV.

El croquis en cuestión representa la escena donde acontecieron los hechos. Éste fue admitido durante el testimonio del sargento Febres García (T.E., Vol. III, págs. 27–32) y, según éste testificó, fue preparado por el policía dibujante-delineante Martínez Bonilla, siguiendo sus instrucciones (íd., pág. 27), conforme con su conocimiento personal del sitio. En resumen, el diseño del croquis está basado en ese conocimiento personal del sargento Febres García y en la información que le suministraron por los policías Pérez Mártir y López Sánchez, testigos oculares del accidente. Se confeccionó mientras el sargento Febres García le indicaba al dibujante Martínez Bonilla dónde colocar y cómo era cada objeto en el croquis.

El argumento del apelante Nazario Hernández sobre la prueba de referencia es que, al admitirse dicho croquis, ello incluyó no sólo las declaraciones (instrucciones) del sargento Febres García para prepararlo, sino también las declaraciones (información adicional) de los policías Pérez Mártir y López Sánchez, información más allá del conocimiento personal del sargento Febres García sobre la escena allí representada. *Tampoco tiene razón.* Nos explicamos.

■ De entrada, es obvio que el croquis es una *evidencia demostrativa* cuya misión es ilustrar "mejor" los testimonios; la Regla 80 de Evidencia, 32 L.P.R.A. Ap. IV, regula liberalmente su admisibilidad. La evidencia demostrativa se divide en *real* e *ilustrativa*. La demostrativa *real* (u original), por propia definición, juega un papel central y directo en el asunto que sea objeto de la controversia.[4] En contraste, la evidencia demostrativa ilustrativa es únicamente para enseñar, instruir, representar o hacer más comprensible un testimonio u otra evidencia. Obviamente, el croquis impugnado se admitió como evidencia demostrativa ilustrativa.

---

[4] Algunos ejemplos serían el arma utilizada por el acusado, un recipiente de gasolina en un fuego; la ropa de la víctima, un vehículo chocado, etc.

■ La diferencia sobre su uso la expresa así el profesor Chiesa:

> En el caso de la evidencia ilustrativa, cuyo fin es ilustrar o clarificar un testimonio, como por ejemplo un *croquis,* un *chart,* una fotografía, lo único que el proponente debe establecer es que tal evidencia es de ayuda al juzgador para entender otra evidencia, particularmente el testimonio de un testigo. En estos casos *el origen de la evidencia ilustrativa tiene poca o ninguna importancia.* Lo mismo da que un testigo vaya a la pizarra y el mismo haga un dibujo que ilustre su testimonio o utilice un modelo, *croquis,* etc. *preparado por él u otra persona.* Lo único importante es que el tribunal entienda que la evidencia ilustrativa hace más comprensible la otra evidencia. (Énfasis suplido.) E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia,* San Juan, Pubs. J.T.S., 1983, Vol. I, pág. 514.

En el caso de autos, el croquis era admisible bajo la Regla 80 de Evidencia, *supra,* para ayudar al Jurado a entender otra evidencia, particularmente el testimonio inicial del sargento Febres García y, además, el testimonio posterior del policía López Sánchez. Parafraseando al profesor Chiesa, el origen del croquis es, en este sentido, inmaterial, ya fuera preparado por el testigo o un dibujante. A igual conclusión llegamos en cuanto a las fotografías admitidas.

Advertimos, además, que el croquis no constituyó una prueba de referencia bajo la Regla 60 de Evidencia, 32 L.P.R.A. Ap. IV. No se trata de declaraciones del sargento Febres García *fuera* del tribunal para probar la verdad de lo aseverado; la prueba sustantiva fue el testimonio del propio Febres García *en sala.* Repetimos, el croquis sólo se admitió para instruir y hacer más comprensible su testimonio.

En la alternativa, aun concediendo que el croquis, por haber sido preparado por instrucciones del sargento Febres García, en rigor científico, incluía prueba de referencia en relación con declaraciones hechas fuera del tribunal, estaríamos ante una prueba de referencia admisible bajo la Regla 63 de Evidencia, 32 L.P.R.A. Ap. IV, ya que el sar-

gento Febres García y los policías Pérez Mártir y López Sánchez estuvieron sujetos —y como realidad forense fueron sometidos— a un detallado e intenso contrainterrogatorio. Véanse: *Pueblo v. Esteves Rosado*, 110 D.P.R. 334 (1980); *Pueblo v. Adorno Cabrera,* 133 D.P.R. 839 (1993).

■ De esa forma, los dos (2) elementos de la alegada prueba de referencia múltiple —esto es, las declaraciones del sargento Febres García para preparar el croquis, además de las de Pérez Mártir y López Sánchez, en cuanto a que brindaron información adicional más allá de la dimanante del conocimiento personal del sargento Febres García— quedaron comprendidos dentro de la excepción a la prueba de referencia provista en la Regla 63 de Evidencia, *supra*. A fin de cuentas, en virtud de la Regla 66 de Evidencia, *supra*, que reglamenta lo concerniente a la *prueba de referencia múltiple*, "[e]s admisible prueba de referencia que contiene a su vez prueba de referencia *si tanto la prueba de referencia principal como la subordinada o incluida caen en el ámbito de alguna excepción a la regla de prueba de referencia*". (Énfasis suplido.)

## IV

*SEGUNDO ERROR*: Incidió el Honorable Tribunal en no [adoptar] prueba que debió haber admitido con el testimonio de la Química, Sra. Migdalia Fernández. Alegato, pág. 3

El apelante Nazario Hernández argumenta que el testimonio de la química señora Fernández "fue vago e impreciso". Alude que, al ser contrainterrogada y confrontada con un artículo en el *American Journal of Clinical Patology*, contestó no estar de acuerdo con su contenido, que carecía de una opinión o no sabía sobre el asunto. Sostiene que el Jurado debió leer dicho artículo, pues contenía conclusiones distintas a la de la química.

El planteamiento expone, en síntesis, sobre la exclusión indebida del contenido del artículo, ya que era valioso como prueba *sustantiva* o de *impugnación.* Exploremos con brevedad esas dos (2) rutas.

En cuanto a la *impugnación* se refiere, la transcripción (T.E., Vol. XI, págs. 26–30) revela la amplia oportunidad que tuvo para confrontarla e impugnarla con el contenido del artículo. Las contestaciones y la postura asumida por la química señora Fernández ante el referido artículo fueron objeto de análisis por el Jurado. Ahora bien, si ese contrainterrogatorio no fue efectivo ni generó duda razonable en el Jurado, es otra cosa.

Como prueba *sustantiva* —para probar la verdad de las declaraciones contenidas en el artículo— era de referencia e inadmisible, pues el autor del artículo no declaró en el juicio. Tampoco cabía invocar la excepción de la Regla 65(R) de Evidencia, 32 L.P.R.A. Ap. IV, pues no demostró, mediante conocimiento judicial o testimonio pericial, que el autor del artículo era una *autoridad confiable en la materia.* No presentó prueba pericial alguna sobre este punto ni solicitó que se tomara conocimiento judicial.

Lo mismo ocurrió en cuanto a una hoja administrativa "de control que se lleva en las estaciones". Lo menos que podemos decir es que también ejercitó ampliamente el derecho a contrainterrogar (T.E., Vol. XI, págs. 73–77), y la Fiscal, en el redirecto, preguntó sobre el particular a los fines de que la testigo aclarara el asunto. Además, estamos convencidos de que la prueba de refutación (*rebuttal*) de El Pueblo (íd., págs. 77–79), en efecto rebatió y aclaró cualquier duda sobre la fidelidad de la prueba de aliento (T.E., Vol. XIII, págs. 20–79; Vol. XV, págs. 8–12).

En este extremo, es importante destacar que "la cláusula de confrontación garantiza una oportunidad para un contrainterrogatorio efectivo, no uno que la defensa desee sea efectivo en cualquier forma o para cualquier extensión". (Traducción nuestra.) *Delaware v. Fensterer,*

474 U.S. 15, 22 (1988). "Las armas o los mecanismos disponibles para impugnar una declaración de un testigo cuando dice que ha perdido la memoria, naturalmente no siempre serán exitosos; un contrainterrogatorio exitoso no es una garantía constitucional." (Traducción nuestra.) *United States v. Owens*, 484 U.S. 554, 560 (1988).

Repetimos que un acusado tiene el derecho constitucional a contrainterrogar los testigos de cargo sin restricciones arbitrarias o injustificadas, pero no a una garantía de que triunfe mediante una absolución.

## V

*TERCER ERROR*: El Tribunal negó al amparo de una Regla 9 propuesta por la defensa para que no fuera al jurado prueba de dudosa veracidad y confiabilidad en relación con la embriaguez del acusado. Alegato, pág. 15.

El apelante Nazario Hernández cuestiona la admisión en evidencia del resultado de su prueba, que arrojó .17% de alcohol en su sangre aproximadamente una hora después del accidente. Aduce una discrepancia en los documentos.[5]

Independientemente de que el examen de esos documentos no revele algunas de esas discrepancias, el tribunal de instancia correctamente admitió esa prueba y dejó al Jurado estimar su valor, con el beneficio de toda la prueba de impugnación presentada por la defensa mediante el contrainterrogatorio y en su turno.

---

[5] A saber, que "el número de la hoja de los pasos operacionales aparecía con su número de serie que no necesitaba para nada borrarse o escribirse sobre ella contenía unos sobre escritos" (Alegato, pág. 15); "en la hoja de cotejo de administración aparece que fue el Policía Mercado el que hizo la muestra cuando fue el Policía Víctor López, el que la hizo" (íd.); "parte del número de Seguro Social del imputado aparece en otra línea de otro acusado que no es la línea donde debe estar" (íd., pág.16); "donde señala la hora de la muestra tenía una serie de entrerrenglonadura que no se notaba claramente la hora en que se tomó la muestra" (íd.); "[a]parecía además que se tomaron dos muestras a la misma hora" (íd.).

La pertinencia de esos documentos era obvia. El apelante Nazario Hernández nos dice que "si tal prueba iba al jurado era una cuestión de hechos que hacía más daño al acusado". Alegato, pág. 16. De ese modo invoca de manera implícita la Regla 19(a) de Evidencia, 32 L.P.R.A. Ap. IV, sobre exclusión de prueba por el "peligro de causar perjuicio indebido". Tampoco tiene razón.

■ No cabe duda de que la prueba de embriaguez presentada le era perjudicial, pero esa es precisamente la razón por la cual el Fiscal la ofreció como prueba de cargo. Ello no configura ni es sinónimo de "perjuicio indebido", sino que más bien forma parte natural del proceso adversativo evidenciario. Chiesa nos expone: "Una parte ofrece evidencia que tiende a causar perjuicio —no beneficio— a la otra parte. Una objeción en términos de que se excluya la evidencia por su efecto perjudicial no tiene mucho sentido; la otra parte puede contestar que justamente la ofrece para perjudicar o refutar las alegaciones de quien objeta. *Perjuicio indebido se refiere más bien a evidencia cuyo valor objetivo es mucho menor al que puede recibir por parte del juzgador en virtud de factores, por ejemplo, emocionales.*" (Énfasis suplido.) Chiesa, *op. cit.*, págs. 62–63.

En este caso, el apelante Nazario Hernández tiene que aceptar "la realidad de que la evidencia pertinente ofrecida por una parte es siempre —o casi siempre— perjudicial a la otra parte; justamente por eso se ofrece. De ahí que no debe excluirse evidencia, bajo la Regla 19, meramente por su efecto perjudicial". Chiesa, *op. cit.*, pág. 63.

Actuó, pues, con corrección el tribunal de instancia al pasar al Jurado la evaluación de la evidencia sobre el resultado de la prueba de alcohol, como asunto de *pertinencia condicionada,* y dejó en manos de esos juzgadores la interrogante de si el resultado de .17% de alcohol correspondía a la prueba realizada al acusado.

Coincidimos con el análisis siguiente del Procurador General:

La defensa contrainterrogó extensamente al testigo Víctor López Sánchez, quien sometió al acusado a la prueba de aliento. Tuvo oportunidad de impugnar la prueba de alcohol con su prueba de defensa. Contrainterrogó con efectividad a la química Migdalia Fernández Martínez. El juez impartió la más cuidadosa instrucción sobre pertinencia condicionada en relación con la evidencia sobre el examen de alcohol. ¿De qué se queja entonces el apelante? Se queja de que el jurado le dio credibilidad a la prueba de cargo, pero esto corresponde a la esencia de lo que es un juicio por jurado. (Escolios omitidos.) *Informe*, pág. 25.

El apelante Nazario Hernández argumenta además, que el Ministerio Fiscal no podía acusarlo bajo el Art. 87 del Código Penal, *supra*, a base de la embriaguez, sino sólo por la velocidad. Aduce que el Juez, que presidió la vista preliminar, sólo lo autorizó así.

El señalamiento es inmeritorio. *Primero*, en la vista preliminar, el Hon. Juez Rivera Martínez no admitió la prueba de embriaguez por voz del policía López Sánchez, pero determinó causa probable para acusar por infracción al Art. 87 del Código Penal, *supra*, a base de la velocidad. Esa determinación de causa probable no limitó la autoridad ulterior del Fiscal para acusar o prescindir del elemento de embriaguez como uno de los integrantes de la imprudencia crasa o temeraria. El elemento esencial del referido Art. 87 es causar la muerte de una persona por conducir un vehículo de motor con *imprudencia crasa o temeraria*. En el juicio, el fiscal puede presentar una prueba pertinente sobre cualquier elemento del delito imputado, independientemente de que un juez la haya excluido en vista preliminar.

La decisión del juez de instancia de encontrar causa probable por ese delito, prescindiendo del elemento de embriaguez, no refleja una prohibición a que se presen-

tara una prueba sobre esa conclusión ni que ésta fuera inmaterial. Sencillamente, al momento de la vista preliminar, el magistrado no admitió la prueba de embriaguez por voz del agente López Sánchez, pero encontró causa probable para acusar a base de la velocidad. Recuérdese que en la vista preliminar basta con una *scintilla* de evidencia que tienda a demostrar que el imputado cometió el delito en cuestión y, por ende, procede que se le presente un pliego acusatorio. El magistrado la encontró al examinar meramente el aspecto de la velocidad exagerada. No hacía falta más.

Curiosamente, el acusado trajo como testigo de defensa al Hon. Juez Rivera Martínez, quien presidió la vista preliminar, y no le preguntó nada sobre este planteamiento.

*Segundo*, la vista preliminar es un instrumento procesal que autoriza al Ministerio Fiscal a acusar por determinado delito grave. No impone limitación alguna sobre la prueba que pueda presentar en el juicio; ésta puede ser totalmente distinta, o una combinación de ella o una prueba distinta. *Pueblo v. Figueroa Castro*, 102 D.P.R. 279, 284 (1974).

Aún así, el apelante Nazario Hernández insiste en que conducir en estado de embriaguez no es un elemento de los delitos tipificados en los Art. 86 y 87 del Código Penal, *supra*, por lo que no procedía incluirlo en el pliego acusatorio. No obstante, olvida que, aunque no es un elemento per se, constituye una circunstancia fáctica que abona a demostrar la presencia de negligencia en los casos bajo el citado Art. 86 y de imprudencia crasa y temeraria bajo el referido Art. 87. Resolvemos que no está vedado presentar una prueba de embriaguez bajo el palio de otros artículos que no sean el que específicamente penaliza conducir en dicho estado si, como hemos visto, son pertinentes para demostrar la existencia de factores que, en conjunción, configuran el delito en cuestión. Y *tercero*, el mismo planteamiento fue resuelto en contra del apelante Nazario

Hernández mediante Resolución (Hon. Sylvia Ricard Márquez, Juez) de 13 de marzo de 1991.([6]) Acudió ante nos en *certiorari* y *unánimemente* sostuvimos dicho dictamen.

## VI

*SÉPTIMO ERROR*: No admitir la prueba de cómo trabajan las motoras envueltas en el accidente, en especial la del occiso Eladio Rivera Ocasio. Alegato, pág. 33.

El apelante Nazario Hernández ha discutido con brevedad este señalamiento sin citar autoridad ni invocar jurisprudencia alguna. Evidentemente, con su prueba trató de crear dudas en el Jurado en torno a si las motoras realmente tenían las luces y los biombos encendidos al mo-

---

([6]) En lo pertinente, dicho foro expresó correctamente:

"Declaramos NO HA LUGAR la solicitud de desestimación bajo la Regla 64(p), que la hemos considerado como una moción para eliminar la *alegación de conducir en estado de embriaguez* del pliego acusatorio por el delito de homicidio al conducir un vehículo de motor con Imprudencia Crasa y Temeraria, Artículo 87 del Código Penal, porque *nada en la ley impide que el Ministerio Fiscal alegue dicha conducta como parte de los hechos con los que pretende establecer la culpabilidad del acusado. Esta alegación no es un elemento del delito tipificado en el Artículo 87 del Código Penal, por lo que no era necesario presentar prueba de la misma en la etapa de la vista preliminar correspondiente. Pueblo v. Vélez Pumarejo*, 113 D.P.R. 349, 353, 357 (1982); *Pueblo v. López Carrillo*, 101 D.P.R. 259, 261, 262 (1973).

"También el Ministerio Fiscal puede solicitar la consolidación de una denuncia radicada en el Tribunal de Distrito por un delito menos grave que está relacionado con algún delito grave, pendiente en el Tribunal Superior, por haber surgido del mismo acto o transacción. Regla 89 de las Reglas de Procedimiento Criminal.

"En adición, el Ministerio Fiscal puede radicar una acusación en el Tribunal Superior por aquellos delitos menos graves que fueren también de la jurisdicción del Tribunal de Distrito, o sea, que son de competencia concurrente. Regla 111 de las Reglas de Procedimiento criminal.

"Sobre las dos acusaciones pendientes en contra del acusado, por Conducir en Estado de Embriaguez, Sección 5-801 de la Ley de Vehículos y Tránsito de Puerto Rico, de un examen de las mismas surge que las acusaciones KLE-90-M-0302 y KLE-90-M-0288, están duplicadas, porque las mismas se relacionan con los mismos hechos.

"El Tribunal hace constar que la acusación por la Sección 5-801 de la Ley de Vehículos y Tránsito de Puerto Rico, que se radicó a nivel del Tribunal Superior, se debe desestimar, pero lo hará el juez que tiene a su cargo la vista en su fondo, toda vez que el imputado estaba acusado por el delito de embriaguez en el Tribunal de Distrito y se consolidó dicho caso con la acusación por infracción al Artículo 87 del Código Penal en el Tribunal Superior." (Énfasis suplido y en el original.)

mento del accidente. Según lo expuesto, la prueba de cargo así lo estableció y lo creyó el Jurado.

La defensa presentó a los testigos José Anaya Nieves y Jorge L. Simons Herrera, custodios de los expedientes de reparaciones de las motoras. El veredicto condenatorio refleja que no tuvo éxito.(7)

Al igual que al Jurado, no nos convence la lógica del argumento de que como las motoras tuvieron desperfectos en algún momento antes del accidente, debemos presumir que continuaban con ese desperfecto. La prueba de cargo demostró lo contrario: las motoras estaban con sus focos y biombos encendidos el día del accidente.

## VII

*QUINTO ERROR*: Al negarse un juicio justo e imparcial al acusado entendiendo que con la prueba había quedado probado un caso fuera de duda razonable, en violación del debido proceso de ley y disposiciones de rango constitucional. Alegato, pág. 30.

El error no fue cometido. Basta con releer la relación de hechos expuesta al inicio de esta ponencia para demostrar lo inmeritorio del señalamiento de insuficiencia de la prueba de cargo; al ser creída por el Jurado, estableció la culpabilidad más allá de duda razonable. No hay elemento alguno de pasión, prejuicio o parcialidad que justifique intervenir con esa apreciación; tampoco hay un error manifiesto.

La proposición del apelante Nazario Hernández de que "claramente no hay intención criminal" sólo es

---

(7) No podía ser distinto. *Anaya Nieves* atestó que las motoras estaban en buenas condiciones al momento del accidente (T.E., Vol. XII, págs. 56–57) y se reafirmó en el redirecto. Íd., págs. 63–72. Declaró que la norma era exigir que las motoras estuvieran en óptimas condiciones para los turnos nocturnos. T.E., Vol. XII, pág. 72.

*Simons Herrera* explicó las omisiones en los expedientes de las reparaciones a base de que los policías no los llenaban si no tenían problemas. T.E., Vol. XII, pág. 104. Admitió, sin embargo, que es posible que un policía salga a trabajar con biombo defectuoso de la motora (íd., pág. 114), pero insistió en que la regla era que la motora no salía así de noche. Íd., pág. 115.

susceptible de estimarse en sentido lego, no de derecho penal sustantivo. Ni el delito imputado (Art. 87 del Código Penal, *supra*) ni aquel por el cual fue hallado culpable y sentenciado (Art. 86 del Código Penal, *supra*), requieren *intención* como forma de culpabilidad.[8] Lo contrario tipificaría un asesinato.

Su contención de que tampoco se configuró la negligencia criminal carece igualmente de méritos. Señala factores como la falta de iluminación, que el automóvil estacionado en la carretera violaba la ley y que la velocidad de setenta (70) a setenta y cinco (75) millas que alcanzaba su vehículo fue puesta en entredicho con otro testimonio. Estas alegaciones fueron dirimidas por el Jurado en su contra luego de contar con el beneficio de toda la prueba. El cuadro fáctico completo muestra no sólo la negligencia que requiere la primera modalidad del citado Art. 86, sino también la segunda vertiente, esto es, ocasionar la muerte a otra persona al efectuar un acto ilegal que no constituya delito grave. Veamos. Este Art. 86 dispone:

> Toda persona que obrando con negligencia o que al realizar un acto ilegal que no constituye delito grave, ocasionara la muerte a otra, será sancionada con pena de reclusión por un término fijo de un (1) año y ocho (8) meses. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de tres (3) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año y tres (3) meses.
>
> El tribunal a su discreción, podrá imponer la pena fija de reclusión establecida o pena de multa que no excederá de tres mil (3,000) dólares, o ambas penas.
>
> Cuando el homicidio involuntario se cometa por una persona al conducir un vehículo de motor, se le impondrá pena de reclusión por un término fijo de un (1) año. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta

---

[8] Las formas de culpabilidad son intención y negligencia. Para algunos delitos, basta con la negligencia; en otros, se requiere la intención. El homicidio involuntario del Art. 86 del Código Penal, 33 L.P.R.A. sec. 4005, es que la persona haya "obrado con negligencia". Lo mismo con el Art. 87 del Código Penal, 33 L.P.R.A. sec. 4006, pero la diferencia estriba en el grado mayor de negligencia requerido para una convicción. *Pueblo v. Gutiérrez Solís*, 98 D.P.R. 89 (1969).

un máximo de tres (3) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de seis (6) meses y un día. El tribunal podrá imponer la pena de restitución en adición a la pena de reclusión establecida, o ambas penas.

No empece lo dispuesto en el Artículo 12 de [este Código], el delito de homicidio involuntario según expuesto en el presente artículo se considerará delito menos grave y el acusado tendrá derecho a juicio por jurado.

El Art. 16 del Código Penal, 33 L.P.R.A. sec. 3091, consigna:

Responde por negligencia la persona que ha producido un resultado delictuoso sin quererlo, por imprudencia o descuido, o falta de circunspección o impericia o por inobservancia de la ley.

Al comentar la negligencia en el contexto del homicidio involuntario, expresa Dora Nevares-Muñiz en su "Análisis Editorial del Art. 86 del Código Penal":

En el contexto del delito de homicidio involuntario, el elemento típico de la negligencia se puede dar de una o varias de las anteriores formas. Se trata de aquella conducta que se aleja del cuidado, atención, prudencia y pericia, que se espera del hombre prudente y razonable en igualdad de circunstancias. Además, el acto puede revestir la forma de una acción o de una omisión. Véase LAFAVE & SCOTT, 591.

Se pueden identificar los siguientes requisitos propios de la negligencia criminal o culpa: 1) una acción u omisión voluntaria pero no intencional, 2) ejecutada sin tomar las precauciones necesarias para evitar resultados perjudiciales, o al violar una ley o reglamento; y 3) que el resultado dañoso sea previsible para el sujeto activo, aunque no querido. (Escolio omitido.) D. Nevares-Muñiz, *Código Penal de Puerto Rico*, Hato Rey, Ed. Instituto para el Desarrollo del Derecho, 1993, pág. 129.

Ciertamente, el conducir a exceso de velocidad en el caso de autos constituyó un acto de imprudencia e inobservancia de la ley que, unido al factor de la embriaguez, configuró el delito de homicidio involuntario. En cuanto a conducir en estado de embriaguez, penalizado como menos grave en la Sec. 5-801 de la Ley de Vehículos y Tránsito de Puerto Rico, *supra*, aplica específicamente la

modalidad de ocasionar la muerte a otro al realizar un acto ilegal que no constituye delito grave. Expresa Dora Nevares-Muñiz, al discutir esta vertiente:

Entendemos, que el acto ilegal a que hace referencia el tipo legal debe ser un delito menos grave. Así lo sostienen las *Instrucciones al Jurado*, 128, y la jurisprudencia del Tribunal Supremo. Distíngase que cuando se trata de muertes causadas por conductores de vehículos de motor, el acusado puede haber realizado varios actos ilegales que no equivalen a delitos menos graves. E.g., no tocar bocina cuando la ley lo requiere, conducir a velocidad mayor que el límite autorizado, no detenerse ante una señal de pare. En estos casos, si ocurre una muerte como consecuencia de tales actos, será homicidio involuntario en la modalidad de negligencia (i.e., por inobservancia de la ley).

Bajo la modalidad aquí discutida, la intención del acusado es la que motivó el delito menos grave. Según lo dice el nombre del tipo legal, la muerte que sobreviene al acto del acusado es involuntaria, ya que no es producto de su propósito o voluntad de causar tal resultado. Sin embargo, el establecerse un nexo de causalidad próxima entre el acto del acusado y la muerte que sobreviene, se le impone responsabilidad a título de homicidio involuntario. Véase: *Pueblo* v. *Figueroa*, 80 D.P.R. 329 (1958); *Pueblo* v. *Rivera Márquez*, 96 D.P.R. 758 (1968); *Pueblo* v. *Martínez Vega*, 98 D.P.R. 946 (1970). Nevares-Muñiz, *op. cit.*, pág. 128.

De otro lado, el argumento de que medió negligencia del conductor que dejó estacionado el vehículo en pleno expreso y ello motivó la intervención de los policías, es patentemente frívolo. La negligencia de otra persona sólo exonera a un acusado si es la única causa del accidente mortal. *Pueblo v. Pinto Medina*, 90 D.P.R. 585, 592–593 (1964).

## VIII

*CUARTO ERROR*: En negarse a declarar con lugar una Moción para que el caso de Art. 86 que fue lo que finalmente el jurado trajo un veredicto de culpabilidad por esta y por una violación a la sección 5-801 de la Ley de Vehículos y Tránsito, señalando no procedía enviar el caso para un informe para beneficio del im-

putado de una Sentencia Suspendida, de ser acreedor de ella entendiendo el Hon. Juez que como el Art. 87 de negligencia crasa y temeraria estaba plasmado sobre dos actuaciones negligentes había quedado cubierto por el veredicto de culpabilidad en la sección 5-801 de la Ley de Vehículos de Tránsito. (Guiar en estado de embriaguez, Ley 141). Alegato, pág. 17.

El planteamiento básico es que el Art. 2 de la Ley Núm. 259 de 3 de abril de 1946, según enmendada, 34 L.P.R.A. sec. 1027 —que regula la sentencia suspendida— no impide que el apelante Nazario Hernández pueda recibir ese beneficio, a pesar de haber sido hallado culpable de homicidio involuntario y conducir en estado de embriaguez.

La Asamblea Legislativa aprobó la Ley Núm. 61 de 19 de junio de 1965 (34 L.P.R.A. sec. 1027) "[p]ara enmendar el Artículo 2 de la Ley 259 de 3 de abril de 1946, según enmendada, que establece el sistema de libertad a prueba, a los fines de incluir el delito de homicidio involuntario que no sea ocasionado mientras se conduzca un vehículo en estado de embriaguez". 1965 Leyes de Puerto Rico 127. Lo hizo añadiendo el siguiente párrafo al Art. 2 de la Ley de Sentencia Suspendida, 34 L.P.R.A. sec. 1027:

Con arreglo a lo anteriormente dispuesto, el tribunal sentenciador podrá también suspender los efectos de la *sentencia de cárcel* que se hubiere dictado en todo caso de homicidio involuntario *que no se hubiere ocasionado mientras se conducía un vehículo en estado de embriaguez.* (Énfasis suplido.)

*Este texto permanece inalterado hasta el día de hoy*, a pesar de las múltiples enmiendas posteriores.(⁹) La Ley Núm. 61, *supra*, aclaró que *no se suspendería la sentencia* si el delito de homicidio involuntario se hubiera oca-

---

(⁹) En lo pertinente, las Leyes Núms: 93 de 30 de mayo de 1970; 61 de 23 de junio de 1971 (Art. 1); 15 de 17 de abril de 1972; 119 de 22 de julio de 1974 (Art. 1); 19 de 5 de agosto de 1975; 99 de 22 de junio de 1977; 160 de 20 de julio de 1979 (Sec. 1); 105 de 4 de junio de 1980 (Sec. 1); 22 de 3 de junio de 1985; 50 de 9 de agosto de 1989 (Art. 4); 8 de 30 de noviembre de 1989; 33 de 27 de julio de 1993 (Art. 1), y 56 de 5 de agosto de 1993 (34 L.P.R.A. sec. 1027).

sionado mientras se conducía un vehículo en estado de embriaguez.

Aunque el Código Penal no tipifica específica y separadamente el delito de "homicidio involuntario causado por conducir un vehículo en estado de embriaguez", la intención legislativa es clara. Ello se explica si tomamos en cuenta que la negligencia que causa el homicidio involuntario puede ser de distintas formas o modalidades; una, manejar negligentemente un vehículo de motor; más aun, si se hace en estado de embriaguez. Si como en el caso de autos, de las alegaciones en la acusación y prueba de cargo surge la modalidad *embriaguez*, el acusado convicto no cualifica para una sentencia suspendida.

En el pliego acusatorio se imputó expresamente que la muerte de la víctima fue causada por la imprudencia crasa del acusado al conducir un vehículo a velocidad exagerada y "bajo los efectos de bebidas embriagantes (0.17%)". Véase acusación bajo Artículo 87 del Código Penal, Apéndice I. *La prueba de cargo estableció hasta la saciedad el elemento de conducir en estado de embriaguez; el jurado le dio crédito a esta prueba.* Más aún, al acusado se le imputó expresamente infracción a la Sección 5-801 de la Ley de Vehículos y Tránsito (9 L.P.R.A. sec. 1041), según se aprecia en la acusación correspondiente (Apéndice I). El jurado lo halló culpable por este delito.

Estamos ante la situación en que no cabe duda de que el jurado halló al acusado culpable por homicidio involuntario y por conducir en estado de embriaguez, con relación al mismo evento: el impacto a la víctima, que causó su muerte. Si ésta no es la exclusión contemplada por la Ley 61 de 19 de junio de 1965 (limitar la sentencia suspendida al "homicidio involuntario que no hubiera sido ocasionado mientras se conducía un vehículo en estado de embriaguez"), ¿a qué otra cosa podría haberse referido el legislador? Se trata de una disposición legislativa con tres décadas de vigencia, no alterada a pesar de las múltiples enmiendas que ha sufrido el estatuto en esos 30 años. Informe, pág. 30.

La referencia del apelante Nazario Hernández a la suspensión de una sentencia por infracción al Art. 87 del Código Penal, *supra* —muerte al conducir un vehículo de motor mediante imprudencia crasa o temeraria— *es*

*impertinente.* Aunque así fue acusado, el Jurado lo halló culpable por el Art. 86 del Código Penal, *supra*, homicidio involuntario, delito menor incluido. *No debemos, pues, mezclarlos.*

■ Respecto al Art. 87 del Código Penal, *supra*, la Ley Núm. 50 de 9 de agosto de 1989 (9 L.P.R.A. secs. 1041–1042, 1044, y 34 L.P.R.A. sec. 1027) enmendó la Ley Núm. 259 de 3 de abril de 1946, Ley de Sentencia Suspendida, según enmendada, 34 L.P.R.A. secs. 1026–1029, para excluir a las personas convictas de imprudencia crasa o temeraria al conducir un vehículo de motor en estado de embriaguez.

■ De la *Exposición de Motivos* de esa Ley Núm. 50 aflora que es una medida para combatir el grave problema de embriaguez[10] en las carreteras. 1989 Leyes de Puerto Rico 187. Incluso, esta ley redujo el porcentaje de alcohol para activar la presunción de embriaguez; aumentó la pe-

---

[10] El acusado apelante pretende hacer una distinción, para efectos de recibir los beneficios de una sentencia suspendida, entre estar en "embriaguez" y "bajo los efectos de bebidas embriagantes". Señala que el Ministerio Público tenía el deber de probar su estado de embriaguez más allá de duda razonable, no bastando su convicción por conducir bajo los efectos de bebidas embriagantes. Dice que no es lo mismo guiar bajo los efectos de bebidas embriagantes —esto es, estar "picado" o "alegre"— que estar en embriaguez, o "borracho".

Tal distinción carece de méritos en el caso de autos. Olvida que la Ley Núm. 50 de 9 de agosto de 1989 (9 L.P.R.A. secs. 1041–1042 y 1044, y 34 L.P.R.A. sec. 1027) —que él mismo levanta— señala, en lo pertinente, en su Exposición de Motivos:

"El propósito de esta ley es adoptar medidas que nos permitan sacar a los conductores *ebrios* de nuestras carreteras e imponer a éstos medidas que desalienten estos hábitos y faciliten su rehabilitación. De esta forma se reducirán las muertes y daños causados por los accidentes de tránsito *y especialmente aquellos ocasionados por la conducción bajo los efectos del alcohol.*" (Énfasis suplido.) 1989 Leyes de Puerto Rico 187, 188.

Ya en su texto, la ley, por un lado, niega los efectos de la sentencia suspendida en los casos de imprudencia crasa o temeraria al conducir un vehículo de motor en estado de embriaguez y, por otro, fija las cantidades de alcohol en la sangre que activen las presunciones en cuanto a "Conducción de Vehículos de Motor bajo los Efectos de Bebidas Embriagantes". Leyes de Puerto Rico, *supra.*

La ley no hace distinciones sutiles entre ambos conceptos sino que, para atajar el problema de muertes en la carretera a consecuencia del manejo de vehículos por conductores ebrios, dispone sobre ambos extremos como dirigidos al mismo propósito.

Es por eso que no podemos acoger su juego de palabras y excluirlo del ámbito del Art. 2 de la Ley de Sentencia Suspendida, 34 L.P.R.A. sec. 1027.

nalidad por conducir en estado de embriaguez (Ley de Vehículos y Tránsito de Puerto Rico); y, en su Art. 4, enmendó el Art. 2 de la Ley Núm. 259, *supra*, para *añadir* a las exclusiones del beneficio de la sentencia suspendida la sentencia por imprudencia crasa o temeraria al conducir un vehículo de motor en estado de embriaguez.([11])

Inadvertidamente, el proceso legislativo se realizó con vista al texto de la ley anterior a la enmienda que introdujo la Ley Núm. 50, *supra*, y ello tuvo el efecto involuntario de suprimir el texto aprobado con la Ley Núm. 50, *supra*, sobre la exclusión de probatoria al convicto por imprudencia crasa o temeraria al conducir un vehículo de motor en estado de embriaguez.

Estamos ante un error legislativo, tal como se desprende de la Ley Núm. 8 de 30 de noviembre de 1989 (34 L.P.R.A. sec. 1027): "Para enmendar el Artículo 2 de la Ley 259 de 3 de abril de 1946, según enmendada, a fin de excluir de sus alcances a las personas convictas por ciertas infracciones a la Ley 17 de 19 de enero de 1951" (Ley de Armas de Puerto Rico). 1989 Leyes de Puerto Rico 616. *Sería absurdo interpretar que el propósito fue eliminar* escasamente tres (3) meses después de aprobada la enmienda introducida por la Ley Núm. 50, *supra*.

Enfatizamos que ese trámite e inadvertencia sólo podría beneficiar a un convicto por infracción al Art. 87 del Código Penal, *supra*; no al apelante Nazario Hernández, convicto y sentenciado bajo el Art. 86 del Código Penal, *supra*. A él le aplica la Ley Núm. 61 de 19 de junio de 1965 (34 L.P.R.A. sec. 1027) cuyo texto ha permanecido por tres (3) décadas inalterado hasta hoy:

Con arreglo a lo anteriormente dispuesto, el tribunal senten-

---

([11]) Coetáneamente, la Asamblea Legislativa consideraba una enmienda para excluir de los beneficios de una sentencia suspendida a las personas convictas por ciertas infracciones a la Ley de Armas de Puerto Rico. Esto se hizo mediante la Ley Núm. 8, *supra*.

ciador podrá también suspender los efectos de la sentencia de cárcel que se hubiera dictado en todo caso de homicidio involuntario *que no hubiera sido ocasionado mientras se conducía un vehículo en estado de ambriaguez.* (Énfasis suplido.)

No estamos ante una situación que involucra la aplicación del canon de interpretación restrictiva de la ley penal cuando, luego de acudir a los principios reconocidos de hermenéutica estatutaria, exista ambigüedad y el acusado sea acreedor al beneficio de la duda. A fin de cuentas, la interpretación restrictiva de la ley penal es sin menoscabo de la intención legislativa conocida o evidente. *Pueblo v. De León Martínez,* 132 D.P.R. 746 (1993).

*Se dictará sentencia confirmatoria.*